# EXPERT REPORT OF HAL PORET IN MATTER OF ORGAIN, INC. V. NORTHERN INNOVATIONS HOLDING CORP. DBA PURELY INSPIRED ET AL.

PREPARED BY:

Hal Poret

President, Hal Poret LLC

142 Hunter Ave

Sleepy Hollow, NY 10591

April 2020

## *TABLE OF CONTENTS*

Page #

BACKGROUND AND PURPOSE --------------------------------------------------    3
STUDY AUTHORSHIP AND QUALIFICATIONS ----------------------------    7
STUDY DESIGN ----------------------------------------------------------------------    8
SUMMARY OF FINDINGS ----------------------------------------------------------   31
METHODOLOGY -----------------------------------------------------------------------   33
    THE RELEVANT UNIVERSE OF INTEREST -------------------------   33
    SAMPLING PLAN -----------------------------------------------------------   39
    DATA PROCESSING --------------------------------------------------------   42
    INTERVIEWING PROCEDURES ---------------------------------------   42
    DOUBLE-BLIND INTERVIEWING --------------------------------------   42
    INTERVIEWING PERIOD ----------------------------------------------------   42
    QUALITY CONTROL ------------------------------------------------------   42
DETAILED FINDINGS --------------------------------------------------------------------   46

THE FOLLOWING APPENDICES ARE PROVIDED SEPARATELY:
APPENDIX A:   CURRICULUM VITAE OF STUDY'S AUTHOR
APPENDIX B:   QUESTIONNAIRE
APPENDIX C:   SCREENSHOTS OF SURVEY
APPENDIX D:   SURVEY DATA FILE
APPENDIX E:   IMAGES USED IN SURVEY

## BACKGROUND AND PURPOSE

Plaintiff Orgain, Inc. (Orgain) puts out plant-based nutritional protein powder and ready-to-drink (RTD) protein shake products using the following trade dress:




Orgain alleges it has rights in the trade dress of the overall appearance and design of its products, including but not limited to the following elements:[1]

---

[1] I understand that during the pendency of the lawsuit, the design of the Orgain plant-based RTD protein shake product was changed to use a blue cap and blue band at the bottom instead of green. The survey tested the Orgain RTD product shown above, which was on the market prior to and during the initial phase of the lawsuit.

- ORGANIC PROTEIN displayed in a particular, black font against a white background.[2]
- Placement of ORGANIC PROTEIN just above the center of the container with its house brand (Orgain) located above ORGANIC PROTEIN.
- ORGANIC PROTEIN is framed inside green bands that circumscribe the top and bottom portions of the container.
- The front label incorporates a green leaf and colored circles highlighting the dietary profile of the product

Defendants (Purely Inspired) put out competitive plant-based protein powder and RTD protein shakes using the following trade dress:

---

[2] Orgain separately claims trademark rights to the word mark ORGANIC PROTEIN in connection with its products.




Orgain alleges that the trade dress of the Purely Inspired products (including the use of the words "Organic Protein" in a bold and prominent fashion at the center of the product) creates a likelihood of confusion with respect to Orgain.  Counsel for Orgain retained me to design and conduct surveys to test: (1) the extent to which, if at all, the Purely Inspired protein powder product creates a likelihood of confusion with respect to the Orgain protein powder trade dress; and (2) the extent to which, if at all, the Purely Inspired RTD protein shake product creates a likelihood of confusion with respect to the Orgain RTD protein shake trade dress.  This Report describes the methodology, execution and results of my surveys.  As discussed below in more detail, the surveys showed that there is a substantial likelihood of confusion – net confusion rates of 17.0% for the protein powder product and 26.5% for the RTD protein shake product (after deducting Control Group results to account for survey noise).

In connection with designing my survey and preparing this Report I reviewed the
following materials:

- Complaint (7-18-18)
- Orgain.com website
- Purelyinspired.com website

I also conducted numerous online searches for the specific products at issue as well as
other organic, plant-based protein powder and RTD protein shake products and
reviewed the results on various websites, including Amazon, GNC, Vitamin Shoppe,
Target, Walmart, and CVS.  I also visited several stores and reviewed the relevant
products and competitive products as displayed in those stores.

The fee for the surveys and this expert report is $60,000.  This includes fees paid to
outside vendors that assisted with the survey sampling, programming, hosting, and
data collection.  My ongoing work in connection with this matter is being billed at my
hourly rate of $725.  Payment is not contingent on the outcome of the litigation.

## AUTHORSHIP AND QUALIFICATIONS

The surveys discussed herein were designed, supervised, and implemented by Hal L. Poret, President at Hal Poret, LLC.

I have personally designed, supervised, and implemented over 1,000 surveys regarding the perceptions and opinions of consumers.  Over 500 have involved consumer perception with respect to trademarks, and over 500 have been conducted online.  I have personally designed numerous studies that have been admitted as evidence in legal proceedings and I have been accepted as an expert in survey research on numerous occasions by U.S. District Courts, the Trademark Trial and Appeal Board, and the National Advertising Division of the Council of Better Business Bureaus (NAD).

I am a member of the American Association of Public Opinion Research, publisher of *Public Opinion Quarterly* and the *Journal of Survey Statistics and Methodology*; the International Trademark Association; and the National Advertising Division of the Council of Better Business Bureaus (NAD).  I routinely conduct market research surveys for a variety of small to large corporations and organizations.

I have frequently spoken at major intellectual property and legal conferences on the topic of how to design and conduct surveys that meet legal evidentiary standards for reliability, including conferences held by the International Trademark Association (INTA), American Intellectual Property Law Association, Practicing Law Institute, Managing Intellectual Property, Promotions Marketing Association, American Conference Institute, and various bar organizations.

In addition to my survey research experience, I hold bachelors and masters degrees in mathematics and a J.D. from Harvard Law School.  Additional biographical material, including lists of testimony and publications, is provided in Appendix A.

## *STUDY DESIGN*

A total of 800 respondents participated in these online surveys among consumers of plant-based protein powder and/or RTD protein shake products,[3] 400 in a survey pertaining to the Orgain and Purely Inspired protein powder products (the Protein Powder Survey) and 400 in a survey pertaining to the Orgain and Purely Inspired RTD protein shake products (the Protein Shake Survey).

Each survey utilized a classic experimental design consisting of a Test Group and a Control (placebo) Group.  For each survey, the Test Group viewed the allegedly infringing Purely Inspired product and the Control Group instead viewed an altered version of the same product that changed the allegedly confusing trade dress while holding all other elements constant.  Accordingly, comparing the results of the Test and Control Groups scientifically measures the extent to which, if at all, the allegedly similar trade dress at issue is likely to cause confusion.

The survey utilized the Sequential Lineup format, which replicates a common marketplace scenario in which consumers are exposed to one company's products and then another company's products.[4]  The Sequential Lineup survey is well-accepted as a standard method for assessing likelihood of confusion in situations where the parties' products or services are directly competitive or sufficiently overlapping such that consumers would be reasonably likely to encounter both in close proximity in the marketplace.[5]

[3] See the Relevant Universe and Sampling sections of this report for more information regarding who qualified for and completed the survey.

[4] 1 McCarthy, J. Thomas.  McCarthy on Trademarks and Unfair Competition, Fourth Edition, Volume 5, 32:177, page 32-291. 2001.

[5] Jerre Swann, Eveready and Squirt – Cognitively Updated, 106 TMR 727 (2016).

A Sequential Lineup format was appropriate in the present circumstances because both parties offer the same type of products (plant-based nutritional protein powder or RTD protein shakes) that are frequently sold to the same consumers through the same or similar online and retail store channels.  Accordingly, the Sequential Lineup survey's presentation of both parties' products in close proximity in the survey appropriately replicates a realistic and representative marketplace scenario in which a consumer who purchases the relevant type of product is exposed to both parties' products in relative proximity in the marketplace.

In the Protein Powder Survey Test Group, respondents were introduced to Orgain's protein powder product/trade dress and then subsequently shown a lineup of three other protein powder products, one at a time.  One of the three subsequent products shown in the line-up was the allegedly infringing Purely Inspired protein powder product.  The other two products were third party organic plant-based  protein powder products.  Each time one of the three products was shown, respondents were asked a series of questions assessing whether or not they believe the product is made by the same company as the product they were first shown (i.e. Orgain) or affiliated with, or sponsored or approved by, the company that makes the first product they were shown.

In the Protein Shake Survey Test Group, respondents were introduced to Orgain's protein shake product/trade dress and then subsequently shown a lineup of three other protein shake products, one at a time.  One of the three subsequent products shown in the line-up was the allegedly infringing Purely Inspired protein shake product.  The other two products were third party organic plant-based protein shake products.  Each time one of the three products was shown, respondents were asked a series of questions assessing whether or not they believe the product is made by the same company as the product they were first shown (i.e. Orgain) or affiliated with, or sponsored or approved by, the company that makes the first product they were shown.

As this survey was conducted online, all the instructions and questions were displayed on respondents' computer screens and each question appeared on its own screen.

<u>Protein Powder Survey -- Test Group</u>

A total of 200 respondents participated in the Protein Powder Test Group. After a series of initial screening questions, all respondents were prompted as follows:

> For this survey please imagine you are shopping for a protein powder product.
>
> The remaining part of the survey has two sections.  For the first section, you will be shown a protein powder product.  Please review the product as you would if you were considering purchasing it.

Next, respondents were shown the following instruction and image of the Plaintiff's protein powder product:

> Please review the following product.  You may click on the image if you would like to view an enlarged version.[6]

---

[6] If desired, respondents could click on the product image (as well as any other product images they saw in the survey) to view an even larger image of the product.



After fifteen seconds elapsed, the following instruction appeared on screen beneath the product image:

> Before continuing with the survey, please indicate whether or not you were able to view the product clearly.
>
> • I viewed the product clearly

- I was unable to view the product clearly

Respondents viewed the product for a minimum of fifteen seconds and confirmed they viewed the product clearly before continuing with the survey. This is a standard quality assurance measure to ensure respondents successfully view the product for an amount of time that allows them to meaningfully participate in the survey.

Respondents were then instructed:

> This concludes the first section of the survey.
>
> If later you are asked about the product you were shown in the <u>first section of the survey</u>, we are referring to the product you were just shown on the last screen.

For the next section of the survey, respondents were questioned (one at a time) about the allegedly infringing Purely Inspired product and two third-party products. Including third-party products in the sequential lineup is standard practice in product categories that have various competing brands besides the parties' products.  Showing the products at issue in the context of an array of other third-party products better replicates realistic marketplace conditions and helps to mask the purpose of the survey by preventing respondents from realizing that a potential connection between Plaintiff's and Defendant's products is the key issue in the survey.  The third-party products used here (Garden of Life and Kos) were selected because they are both competitive organic plant-based protein powders that come in a comparable flavor in a comparable type of container.  Accordingly, since all three of the products shown in the sequential lineup (Purely Inspired, Garden of Life and Kos) have these characteristics, respondents would have no reason to believe that the Purely Inspired product in particular is connected to Orgain unless due to the Purely Inspired trade dress at issue.

The order in which the three protein powder products (Purely Inspired, Garden of Life and Kos) were presented in the second section of the survey was randomized. Each time respondents saw a product they were asked a series of questions. The series of questions asked for each product was identical.

All respondents were prompted as follows:

> For the second and final section of the survey, you will be shown several products, one at a time.  For each one, please look at the product as you would if you were considering purchasing it.  You may click on any product you are shown if you would like to view an enlarged version.
>
> You will be asked some questions about each product.  For any question, if you do not have an opinion, please indicate so. Please do not guess.

Next, respondents were shown and asked about one of the three products in the sequential lineup. While the products were presented in randomized order, for the purpose of this report, I am presenting Defendant's product first:

> Please review the following product and then answer the question below.



Do you think that this product is made by…[7]

- The <u>same</u> company as the product you were shown in the <u>first section</u> of the survey
- A <u>different</u> company than the product you were shown in the <u>first section</u> of

---

[7] The order in which the first two response options appeared, randomized, to account for response bias due to response option order. The order of the response options in all subsequent questions was kept consistent with the order first shown.

the survey
- No opinion/don't know
- I am unable to view the product clearly[8]

Respondents who answered that they think the product is made by the same company as Plaintiff's product were then shown Defendant's product again on a new screen and instructed:

> Please explain in as much detail as possible what makes you think that this product is made by the <u>same</u> company as the product you were shown in the <u>first section</u> of the survey.

Respondents could type in any answer.

Meanwhile, respondents who previously answered either that they think the product is made by a different company than Plaintiff's, or that they have no opinion/don't know, were instead shown Defendant's product again and asked:

> Do you think this product…

- <u>is</u> affiliated with, or sponsored or approved by, the company that makes the product you were shown in the <u>first section</u> of the survey
- is <u>not</u> affiliated with, or sponsored or approved by, the company that makes the product you were shown in the <u>first section</u> of the survey
- No opinion/don't know
- I am unable to view the product clearly

Respondents who answered that they think the product is affiliated with, or sponsored or approved by, Plaintiff, were then shown Defendant's product again and instructed:

---

[8] The survey was programmed in such a way that respondents who might have indicated at any point that they were unable to view a product clearly did not continue, nor did they count toward the final sample size of 800.

> Please explain in as much detail as possible what makes you think this product is
> affiliated with, or sponsored or approved by, the company that makes the
> product you were shown in the <u>first section</u> of the survey.

Respondents could type in any answer.

This concluded the series of questions for the first of the three products respondents
were shown in the sequential line up section of the survey. Respondents were then
asked an identical series of questions two more times, once for each remaining product.

The following is an image of the Garden of Life product that respondents were asked
about:



The following is an image of the Kos product respondents were asked about:



The survey concluded for the Test Group once respondents had been asked about all three products in the sequential lineup.

<u>Protein Powder -- Control Group</u>

The survey included a Protein Powder Control Group comprised of a separate 200 unique respondents.  The Control Group function is to measure the survey "noise" level or "false positive" level – i.e., the tendency of survey respondents to connect the Purely Inspired product to the Orgain product for reasons that cannot be attributed to the similarity of trade dress, such as similarity of product type (plant-based protein powder), similarity of other information, guessing, or other forms of respondent or survey error.[9]  The Control Group alters the allegedly infringing trade dress in order to measure the extent to which respondents will nevertheless connect the parties' products even when shown a control product that does <u>not</u> include the allegedly confusing trade dress.  This allows me to appropriately discount the Test Group rate by deducting this "noise" or "false positive" rate and arriving at a "net" confusion level that can be reliably attributed to the trade dress at issue.

The Control consisted of altering the Purely Inspired trade dress as follows:

---

[9] A Control Group in a survey is akin to a placebo group in a classic scientific experiment. When a Test Group is given a medication and questioned about its impact, a Control or Placebo Group is given a placebo and asked the same questions to assess the extent to which the same result ensues.  A placebo is a pill that <u>removes</u> the active ingredient at issue but changes nothing else.  If, for example, 30% of the Test Group responds that the medication helped their headache, the Control Group must be consulted to determine the extent to which, if at all, this result can be reliably attributed to the effectiveness of the active ingredient.  If 25% to 30% of the Control Group reports that the medication (placebo) helped their headache, we know that the 30% Test Group result cannot be attributed to the effectiveness of the test medication, as those given the placebo had a very similar result.  If, on the other hand, only 10% of the Control Group reports a benefit, we know that the 20% difference between the Test result (30%) and the Control result (10%) must reflect the genuine impact of the Test medication.  The same experimental design (comparing Test and Control Groups) is commonly used in surveys to isolate the impact of the "active ingredient" (in this case, the allegedly similar trade dress at issue) and weed out the impact of any other factors.

**TEST**                                            **CONTROL**

 

This was an ideal control because it changes a minimum amount of the infringing trade dress elements and holds all other elements constant.  Specifically, the control alters only the following elements, which all relate to the claimed trade dress:

- The use of green bands to frame the top and bottom portions of the container
- The prominent display of the term Organic Protein in a distinctive black font at the center of the container in a manner that could appear to be the brand name of the product.

The control holds constant all of the following elements:

- The container design and shape
- The multi-colored band at the top calling out nutritional information.
- The gold band promoting "America's #1 Selling Organic Protein".
- The Purely Inspired name/logo.
- Use of the words "organic" and "protein" in close proximity to describe certain ingredients of the product at the center of the container.
- The language Plant-Based Nutrition in a green color.
- The imagery of chocolate and leaves.
- The "amazing taste" ribbon and flavor description.
- The "No Artificial…" and Non-GMO portion of the label.
- The Net weight information.
- The white background.

Accordingly, the control effectively measures the tendency to connect the Purely Inspired product to the Orgain product due to any of these factors (including it being the same type of product).  In particular, the control measures the tendency to connect the Purely Inspired product to the Orgain product due to factors such as use of the words "Organic" or "Protein" or "Plant-Based" or the use of green fonts/imagery or the use of a white background.  Since all of these individual elements are present on the control, the difference between the Test and Control results isolates the impact of the allegedly similar trade dress.  By subtracting the noise level measured in the Control Group, the resulting level is a "net" confusion level that must be attributed to the similarity of the Purely Inspired trade dress to the Orgain trade dress, and cannot be dismissed as attributable to any other factors or forms of error.

<u>Protein Shake -- Test Group</u>

A separate 200 unique respondents participated in a Protein Shake Test Group.

Respondents in the Protein Shake Test Group were initially prompted:

> For this survey please imagine you are shopping for a ready-to-drink protein shake product.
>
> The remaining part of the survey has two sections.  For the first section, you will be shown a ready-to-drink protein shake product.  Please review the product as you would if you were considering purchasing it.

These respondents then took a survey identical to the Protein Powder Test Group respondents with the sole exception that they were shown a different set of images.

Protein Shake Test Group respondents were first prompted and shown the following Orgain protein shake product:



Respondents subsequently saw three additional products in a sequential lineup. One of the three subsequent products was the allegedly infringing Purely Inspired protein shake product:



The following two third-party products were also included in the sequential lineup for the Protein Shake Group:





The third-party products used here (Owyn and Aloha) were selected because they are both competitive organic plant-based protein drinks that come in a comparable flavor in a comparable type of container.  Accordingly, since all three of the products shown in the sequential lineup had these characteristics, respondents would have no reason to

believe that the Purely Inspired product in particular is connected to Orgain unless due to the particular Purely Inspired trade dress.

The order in which these products were presented was randomized. Each product was presented to respondents in a manner identical to that in the Protein Powder Survey and an identical series of questions was asked for each product as was asked of respondents in the Protein Powder Survey.

<u>Protein Shake -- Control Group</u>

The survey also included a Protein Shake Control Group comprised of a separate 200 unique respondents.  This Control Group altered the allegedly infringing Purely Inspired protein shake product in order to measure the extent to which respondents will nevertheless connect the Purely Inspired product to the Orgain product even when shown a control product that does <u>not</u> include the allegedly infringing trade dress.

The control altered the trade dress of the Purely Inspired product in the same manner as depicted for the Protein Powder products:

**TEST**    **CONTROL**





This was an ideal control because it changes a minimum of the allegedly infringing trade dress elements and holds all other elements constant. Specifically, the control alters only the following elements, which all relate to the claimed trade dress:

- The use of green bands to frame the top and bottom portions of the container

- The prominent display of the term Organic Protein in a distinctive black font at the center of the container in a manner that could appear to be the brand name of the product.

The control holds constant all of the following elements:

- The container design and shape.
- The "Ready to Drink" ribbon at the top.
- The multi-colored band at the top calling out nutritional information.
- The gold band promoting "America's #1 Selling Organic Protein".
- The Purely Inspired name/logo.
- Use of the words "organic" and "protein" in close proximity to describe certain ingredients in the product at the center of the container.
- The language Plant-Based Nutrition in a green color.
- The imagery of chocolate and leaves.
- The "amazing taste" ribbon and flavor description.
- The "20g…" and Non-GMO portion of the label.
- The Net content information.
- The white background.

Since all of these individual elements are present on the control, the difference between the Test and Control results isolates the impact of the allegedly similar trade dress.  By subtracting the noise level measured in the Control Group, the resulting level is a "net" confusion level that must be attributed to the similarity of the Purely Inspired trade dress to the Orgain trade dress, and cannot be dismissed as attributable to any other factors or forms of error.

This concluded the surveys for all respondents.

Screenshots of the survey will be provided in Appendix C.

## *SUMMARY OF KEY FINDINGS*

This section details certain key survey findings.  Other survey results are discussed further in the Detailed Findings section below.

Protein Product Survey

- In the Protein Product Test Group, 38.5% of respondents (77 out of 200) answered that the Purely Inspired protein powder product is made by the same company as the product they were shown in the first section of the survey – i.e. Plaintiff's Orgain product.

- In the corresponding Control Group, 21.5% (43 out of 200) answered that the control product is made by the same company as the Orgain product.

- Subtracting the 21.5% Control Result yields a net confusion rate in the Protein Product survey of 17.0%.  The affiliation/sponsorship/approval question added no additional net confusion.

| Protein Powder Survey – Net Confusion | |
|---|---|
| Test Group Confusion Rate | 38.5% |
| Control Group Noise Rate | 21.5% |
| Net Confusion | 17.0% |

Protein Shake Survey

- In the Protein Shake Test Group, 45.0% of respondents (90 out of 200) answered that the Purely Inspired product is made by the same company as the product they were shown in the first section of the survey – i.e. Plaintiff's Orgain product.

- In the corresponding Control Group, 18.5% (37 out of 200) answered that the control product is made by the same company as the Orgain product.

- Subtracting the 18.5% Control Result yields a net confusion rate in the Protein
  Shake survey of 26.5%.  The affiliation/sponsorship/approval question added no
  additional net confusion.

| Protein Shake Survey – Net Confusion | |
|---|---|
| Test Group Confusion Rate | 45.0% |
| Control Group Noise Rate | 18.5% |
| Net Confusion | 26.5% |

Based on these results it is my opinion that the Purely Inspired protein powder and
protein shake trade dresses create a likelihood confusion with respect to Orgain.

<u>See</u> Detailed Findings section below for additional information on results.  The full data
will be provided in its original electronic form in Appendix D.

## *METHODOLOGY*

### THE RELEVANT UNIVERSE OF INTEREST

The universe for both surveys consisted of U.S. consumers age 18 and older who have personally purchased plant-based protein products in the past six months or are likely to do so in the next six months. Additionally:

- The Protein Powder survey universe was limited to consumers who have personally purchased plant-based protein powder in the past six months or are likely to do so in the next six months

- The Protein Shake survey universe was limited to consumers who have personally purchased ready-to-drink plant-based protein shakes in the past six months or are likely to do so in the next six months.

The following screening questions were employed to ensure the final survey sample was comprised of respondents from the appropriate sample universe.

First, after initial demographic questions, all potential respondents were asked:

> Which of the following, if any, have you personally purchased in the past 6 months?
> *(Select all that apply)*

The following table displays the list of randomized options from which respondents could select as many as applied to them, and the proportion of final respondents in each survey who selected each:

| Purchased Past 6 Months | Protein Powder Survey | Protein Shake Survey |
|---|---|---|
| Total | N=400 | N=400 |
| Protein powder | 89.3% 357 | 66.3% 265 |
| Protein shake (ready-to-drink) | 45.3% 181 | 88.8% 355 |
| Protein bars | 72.0% 288 | 82.3% 329 |
| Multi-vitamins | 78.5% 314 | 82.3% 329 |
| Iron supplements | 30.3% 121 | 38.0% 152 |
| Probiotic supplements | 57.8% 231 | 58.3% 233 |
| Sport drink powder | 32.3% 129 | 38.3% 153 |
| Sport drink (ready-to-drink) | 47.8% 191 | 64.0% 256 |
| None of these | 0.8% 3 | 0.5% 2 |

Next, all respondents were asked:

> Which of the following, if any, are you likely to personally purchase in the next 6 months?
> *(Select all that apply)*

The following table displays the options from which respondents could select as many as applied to them, and the proportion of final respondents in each survey who selected each:

| Likely to Purchase in Next 6 Months | Protein Powder Survey | Protein Shake Survey |
|---|---|---|
| Total | N=400 | N=400 |
| Protein powder | 90.8% 363 | 67.8% 271 |
| Protein shake (ready-to-drink) | 46.0% 184 | 91.0% 364 |
| Protein bars | 75.0% 300 | 83.8% 335 |
| Multi-vitamins | 78.3% 313 | 83.8% 335 |
| Iron supplements | 33.8% 135 | 40.0% 160 |
| Probiotic supplements | 63.5% 254 | 64.8% 259 |
| Sport drink powder | 37.0% 148 | 40.8% 163 |
| Sport drink (ready-to-drink) | 49.0% 196 | 63.0% 252 |
| None of these | 1.5% 6 | 0.5% 2 |

Respondents who previously answered that they have purchased either "protein powder" or "protein shake (ready-to-drink)" were then asked:

> Which of the following type(s) of <u>protein products</u> (protein powders or shakes) have you personally purchased in the past 6 months?
> *(Select all that apply)*

The following table displays the randomized list of options from which respondents could select as many as applied to them, and the proportion of final respondents in each survey who selected each:

| Types of Protein Products Purchased in Past 6 Months | Protein Powder Survey | Protein Shake Survey |
|---|---|---|
| Total | N=400 | N=400 |
| Plant-based protein products | 87.5%<br>350 | 88.5%<br>354 |
| Whey protein products | 51.0%<br>204 | 59.8%<br>239 |
| Other dairy-based protein products | 27.0%<br>108 | 32.3%<br>129 |
| None of these | 0.0%<br>0 | 0.3%<br>1 |
| Don't know/not sure | 0.8%<br>3 | 0.0%<br>0 |
| Not asked/Did not purchase protein powder or shakes in past 6 months | 7.5%<br>30 | 5.3%<br>21 |

Next, respondents who previously answered that they are likely to personally purchase either "protein powder" or "protein shake (ready-to-drink)" were then asked:

> Which of the following type(s) of <u>protein products</u> (protein powders or shakes) are you likely to personally purchase in the next 6 months?
> *(Select all that apply)*

The following table displays the options from which respondents could select as many as applied to them, and the proportion of final respondents in each survey who selected each:

| Types of Protein Products Likely to Purchase in Next 6 Months | Protein Powder Survey | Protein Shake Survey |
|---|---|---|
| Total | N=400 | N=400 |
| Plant-based protein products | 90.8%<br>363 | 93.5%<br>374 |
| Whey protein products | 51.5%<br>206 | 57.8%<br>231 |
| Other dairy-based protein products | 31.5%<br>126 | 34.3%<br>137 |
| None of these | 0.3%<br>1 | 0.0%<br>0 |
| Don't know/not sure | 0.5%<br>2 | 0.0%<br>0 |
| Not asked/Not likely to purchase protein powder or shakes in next 6 months | 5.0%<br>20 | 4.8%<br>19 |

Respondents who answered that they have purchased or are likely to purchase "protein powder" and that they have either purchased or are likely to purchase "plant-based protein products" were considered part of the relevant sample universe for the Protein Powder survey and qualified to participate.

Respondents who answered that they have purchased or are likely to purchase "protein shake (ready-to-drink)" and that they have either purchased or are likely to purchase "plant-based protein products" were considered part of the relevant sample universe for the Protein Shake survey and qualified to participate.

Respondents who qualified for both surveys were randomly assigned by the survey program to participate in one of the two surveys.

Prior to continuing to the main surveys, all respondents were asked an additional question for classification purposed:

For which of the following purposes, if any, do you use plant-based <u>protein products</u>?

*(Select all that apply)*

The following table displays the randomized options from which respondents could select as many as applied to them, and the proportion of final respondents in each survey who selected each:

| Purposes for Plant-Based Protein Products | Protein Powder Survey | Protein Shake Survey |
|---|---|---|
| Total | N=400 | N=400 |
| Muscle-building/weight gain | 39.5%<br>158 | 47.0%<br>188 |
| Added nutrition for smoothies/meals | 74.0%<br>296 | 77.0%<br>308 |
| Post-exercise replenishment | 53.0%<br>212 | 59.3%<br>237 |
| Use in vegetarian/vegan diet | 59.5%<br>238 | 56.8%<br>227 |
| Weight loss | 43.0%<br>172 | 45.3%<br>181 |
| None of these | 0.3%<br>1 | 0.5%<br>2 |
| Don't know/not sure | 0.3%<br>1 | 0.3%<br>1 |

Upon completion of the main survey, all respondents were asked a final question for classification purposes:

    Do you or does anyone in your household work for any of the following?
    *(Select all that apply)*

The following table displays the list of randomized options from which respondents could select as many as applied to them, and the proportion of final respondents in each survey who selected each:

| Related Field | Protein Powder Survey | Protein Shake Survey |
|---|---|---|
| Total | N=400 | N=400 |
| An advertising or market research company | 2.3%<br>9 | 1.3%<br>5 |
| A company that makes or distributes protein products | 1.5%<br>6 | 2.3%<br>9 |
| A store or website that sells protein products | 2.5%<br>10 | 1.8%<br>7 |
| None of these | 95.5%<br>382 | 96.5%<br>386 |

Excluding the negligible number of respondents who work in one of these fields would not impact the results of this study or my conclusions.

The actual wording of the screening questions used is shown in Appendix B.

**SAMPLING PLAN**

The sampling plan involved a random selection of consumers who are part of an online panel.

Online surveys are well-accepted in the field of survey research as a standard, reliable methodology. Indeed, online surveys are now the most common method of conducting market research among consumers. Businesses and other organizations routinely make decisions of importance based on the results of online survey research among consumers, and online surveys have been accepted in evidence in numerous U.S. District Court cases. I have personally designed and executed numerous internet surveys that have been accepted by courts.

The sample of panelists used in the survey was provided by Dynata, a leading supplier of online sample for surveys. I have worked with Dynata on many surveys and have found its procedures and panels to be highly reliable. Dynata has large and diverse

panels consisting of millions of Americans and is highly regarded as a reputable source of respondents for online surveys within the field of market research.  Dynata utilizes appropriate industry procedures for ensuring the integrity and quality of its panels. Through the following techniques, Dynata employs specific process behavior, pattern analysis, statistics and algorithms to ensure top quality data:

- Digital Fingerprinting technology to ensure high quality participants. This includes checking for duplicate participants by evaluating variables, such as email address, matches across several demographic data, and device-related data.
- Double-Opt-In engaged panelists
- Third Party technologies to create non-bias decisions
- Country-specific and relevant incentive model
- Post-collection disqualifications including straightlining[10] with Product Manager consultation, verbatims, and speeders

Additionally, Dynata profiles its panelists and keeps up-to-date on standard demographics, such as age, gender, region, household demographic, interests and hobbies.

A sampling plan was carefully structured in order to represent the demographics of relevant customers for each survey – i.e. consumers of plant-based protein powders or shakes.  Throughout the data collection, I continued to monitor the actual rate of qualification within each individual age and gender group for each survey.  I then calibrated these individual incidence rates against U.S. Census data by age and gender and set revised age and gender quotas for the final sample size of 200 per Test and Control Group in each survey.  The following table displays the final proportion of sample achieved in each Survey by age and gender per Group:

---

[10] "Straightlining" in online surveys is defined as behavior exhibited by respondents when they repeatedly select the same response in a question series or grid.

| Final Number of Respondents by Age and Gender | | |
|---|---|---|
| N=200 per Group per Survey | **Protein Powder Survey** | **Protein Shake Survey** |
| Male 18 – 34 | 15.0% 30 | 17.0% 34 |
| Male 35 – 54 | 15.5% 31 | 17.5% 35 |
| Male 55 and older | 7.5% 15 | 5.5% 11 |
| Female 18 – 34 | 21.5% 43 | 20.5% 41 |
| Female 35 – 54 | 25.0% 50 | 26.0% 52 |
| Female 55 and older | 15.5% 31 | 13.5% 27 |

This methodology for producing a representative sample of the relevant category (here, consumers of the relevant plant-based protein products) is standard and well-accepted.

Survey invitations were sent across the U.S. in geographic proportion to Census data. The following table displays the final proportion of sample achieved by region:

| Final Number of Respondents by Region | | |
|---|---|---|
| N=800 | N | % |
| Northeast | 153 | 19.1% |
| South | 278 | 34.8% |
| West | 236 | 29.5% |
| Midwest | 133 | 16.6% |

## INTERVIEWING PROCEDURES

The online survey was programmed and hosted by Focus Vision, a company specializing in web survey programming and data collection and processing.  My staff and I thoroughly tested the programmed survey prior to any potential respondents receiving the invitation to participate in the survey.

## DATA PROCESSING

Data was collected by Focus Vision and made available to Hal Poret, LLC through an electronic portal on an ongoing basis.  The data set showing respondents' answers to all questions will be provided in electronic form.

## DOUBLE-BLIND INTERVIEWING

The study was administered under "double-blind" conditions.  That is, not only were the respondents kept uninformed as to the purpose and sponsorship of the study, but the services involved in providing the sample and administering the online interviews (Dynata) were similarly "blind" with respect to the study's purpose and sponsorship.

## INTERVIEWING PERIOD

Interviewing was conducted from August 28, 2019 through September 30, 2019.

## QUALITY CONTROL

Several measures were implemented to ensure a high level of quality control and validation with respect to respondents taking the survey.

Upon initially entering the survey, all respondents were required to pass a test to verify that each respondent is a live person. The test employed in this survey is a CAPTCHA[11]

---

[11] CAPTCHA is an acronym for "Completely Automated Public Turing test to tell computers and Humans Apart."

program that generates a task that humans can pass but current computer programs cannot. CAPTCHA is a well-known and widely-used tool in online survey research.

Upon successfully passing the CAPTCHA test, respondents were then asked to enter their year of birth and then their gender.  This information was checked against the sample provider's (Dynata's) demographics on record for each respondent and any respondent providing an incorrect or inconsistent birth year and/or gender was unable to continue to the main survey.

Additionally, respondents were then asked to select their age range. Respondents who selected an age range inconsistent with their year of birth were unable to continue with the survey.

These combined steps ensured that the survey was being taken by an actual live person and that each person was paying a certain level of attention to the survey questions and taking a certain level of care in entering responses.

All respondents were also asked to select any web browsers or search engines they have used in the past three months. Respondents could select as many as applied to them from a list of ten options, including, "other," "not sure" and one fictional name: Hagelin. Respondents who selected "Hagelin" were unable to continue.  Additionally, respondents who answered that they have used all seven of the actual web browsers and search engines included on the response list, were identified as "yea-sayers" and unable to continue with the survey.[12]

---

[12] "Yea-sayers" in surveys are typically defined as respondents who answer affirmatively to questions, regardless of their belief.

The following question was also asked and permitted additional screening out of
respondents who were paying insufficient attention or clicking responses
indiscriminately:

> For quality assurance, please type the word "survey" in the blank next to the
> "Other" box below and then click to continue.
> - Strongly agree
> - Agree
> - Neutral
> - Disagree
> - Strongly disagree
> - Other _____

Respondents who selected "other" and typed a response in the blank continued with
the survey. A review was conducted of all open-ended answers, including responses to
this question and respondents who failed to follow instructions for this question, or
gave other non-responsive or nonsense answers to open-ended questions were removed
from the final data.

Respondents were then also asked to carefully read these instructions:

\*      Please take the survey in <u>one</u> session without interruption.

\*      Please maximize your browser and keep it maximized for the survey.

\*      While taking the survey, please do not consult any other websites or other
electronic or written materials.

\*      Please answer all questions on your own without consulting any other person.

\*      If you normally wear eye glasses or contact lenses when viewing a computer
screen, please wear them for the survey.

Two options were provided in response to these instructions: 1) I understand and agree
to the above instructions, and 2) I do not understand or do not agree to the above

instructions.  Only respondents who understood and agreed to the instructions then
continued to the main section of the survey.

## DETAILED FINDINGS

I.       <u>Protein Powder Survey</u>

***Source Confusion – Same Company***

In the Test Group 38.5% (77 out of 200) answered that Defendant's product is made or put out by the same company as the Orgain product they saw in the first section of the survey. In the corresponding Control Group, 21.5% of respondents (43 out of 200) answered that the control protein powder product is made or put out by the same company as the Orgain product:

| Protein Powder Survey -- Q360: Do you think that this product is made by… | Test Group | Control Group |
|---|---|---|
| **Base** | N=200 | N=200 |
| The <u>same</u> company as the product you were shown in the <u>first section</u> of the survey | 38.5% 77 | 21.5% 43 |
| A <u>different</u> company than the product you were shown in the <u>first section</u> of the survey | 50.5% 101 | 65.5% 131 |
| No opinion/don't know | 11.0% 22 | 13.0% 26 |

This results in a 17.0% net rate of source confusion, as illustrated in the following table:

| Protein Powder Survey – Net Rate of Confusion | |
|---|---|
| Test Group Confusion Rate | 38.5% |
| Control Group Noise Rate | 21.5% |
| Net Rate of Confusion | 17.0% |

*Affiliation, Sponsorship or Approval*

The follow-up question regarding affiliation or sponsorship/approval did not produce any additional net confusion, as the Test Group rate did not exceed the Control Group rate:

| Protein Powder Survey -- Q370: Do you think this product... | Test Group | Control Group |
|---|---|---|
| **Base** | N=200 | N=200 |
| <u>is</u> affiliated with, or sponsored or approved by, the company that makes the product you were shown in the <u>first section</u> of the survey | 6.5% 13 | 10.0% 20 |
| is <u>not</u> affiliated with, or sponsored or approved by, the company that | 33.5% 67 | 49.5% 99 |
| No opinion/don't know | 21.5% 43 | 19.0% 38 |
| Not asked/previously answered products are from the same company | 38.5% 77 | 21.5% 43 |

Because the Test Group result in the affiliation question does not exceed the Control result, this question adds nothing to the net confusion level.

*Third-Party Products*

The following table displays the confusion rate in the Test Group for the Purely Inspired product compared to the results for the two third-party products included in the survey:

| Protein Powder Survey<br>Test Group Confusion Result V. Third-Party Products<br>Q360 & Q370 | Purely Inspired | Garden of Life | KOS |
|---|---|---|---|
| Base | N=200 | N=400 | N=400 |
| The <u>same</u> company as the product you were shown in the <u>first section</u> of the survey | 38.5%<br>77 | 9.3%<br>37 | 5.3%<br>21 |
| A <u>different</u> company than the product you were shown in the <u>first section</u> of the survey | 50.5%<br>101 | 85.3%<br>341 | 85.8%<br>343 |
| No opinion/don't know | 11.0%<br>22 | 5.5%<br>22 | 9.0%<br>36 |

The lower rates of answering that the Garden of Life (9.3%) and KOS (5.3%) products are made by the same company as the Orgain product further validates that the dramatically higher 38.5% result for the Purely Inspired product is not the result of guessing or other forms of respondent or survey error, but is attributable specifically to the similarity of the Purely Inspired trade dress to the Orgain trade dress.

## II.     **Protein Shake Survey**

*Source Confusion – Same Company*

In the Test Group, 45.0% (90 out of 200) answered that the Purely Inspired product is made or put out by the same company as the Orgain product they saw in the first section of the survey.  In the corresponding Control Group, 18.5% of respondents (37 out of 200) answered that the control protein drink product is made or put out by the same company as the Orgain product:

Page | 48

| Protein Shake Survey -- Q360: Do you think that this product is made by… | Test Group | Control Group |
|---|---|---|
| **Base** | N=200 | N=200 |
| The <u>same</u> company as the product you were shown in the <u>first section</u> of the survey | 45.0% 90 | 18.5% 37 |
| A <u>different</u> company than the product you were shown in the <u>first section</u> of the survey | 47.0% 94 | 71.5% 143 |
| No opinion/don't know | 8.0% 16 | 10.0% 20 |

This results in a 26.5% net rate of confusion:

| **Protein Shake Survey – Net Confusion** | |
|---|---|
| Test Group Confusion Rate | 45.0% |
| Control Group Noise Rate | 18.5% |
| Net Rate of Confusion | 26.5% |

### *Affiliation, Sponsorship or Approval*

The follow-up question regarding affiliation or sponsorship/approval did not produce any additional net confusion, as the Test Group rate did not exceed the Control Group rate:

| Protein Shake Survey -- Q370: Do you think this product… | Test Group | Control Group |
|---|---|---|
| **Base** | N=200 | N=200 |
| <u>is</u> affiliated with, or sponsored or approved by, the company that makes the product you were shown in the <u>first section</u> of the survey | 7.5% 15 | 13.5% 27 |
| is <u>not</u> affiliated with, or sponsored or approved by, the company that | 36.0% 72 | 52.5% 105 |
| No opinion/don't know | 11.5% 23 | 15.5% 31 |
| Not asked/previously answered products are from the same company | 45.0% 90 | 18.5% 37 |

Because the Test Group result in the affiliation question does not exceed the Control result, this question adds nothing to the net confusion level.

***Third-Party Products***

The following table displays the confusion rate in the Test Group for the Purely Inspired product compared to the results for the two third-party products included in the survey:

| Protein Shake Survey<br>Test Group Confusion Result V. Third-Party Products<br>Q360 & Q370 | Purely Inspired | Owyn | Aloha |
| --- | --- | --- | --- |
| Base | N=200 | N=400 | N=400 |
| The <u>same</u> company as the product you were shown in the <u>first section</u> of the survey | 45.0%<br>90 | 17.0%<br>68 | 8.3%<br>33 |
| A <u>different</u> company than the product you were shown in the <u>first section</u> of the survey | 47.0%<br>94 | 73.3%<br>293 | 80.0%<br>320 |
| No opinion/don't know | 8.0%<br>16 | 9.8%<br>39 | 11.8%<br>47 |

The lower rates of answering that the Owyn (17.0%) and Aloha (8.3%) products are made by the same company as the Orgain product further validates that the dramatically higher 45.0% result for the Purely Inspired product is not the result of guessing or other forms of respondent or survey error, but is attributable specifically to the similarity of the Purely Inspired trade dress to the Orgain trade dress.

## CONCLUSIONS

Based on the survey results, it is my opinion that the Purely Inspired protein powder and protein shake trade dresses create a likelihood confusion with respect to Orgain.

Hal Poret

Dated:   April 29, 2020