1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ORGAIN, INC.,<br><br>        Plaintiff,<br><br>        v.<br><br>NORTHERN INNOVATIONS HOLDING CORP. ET AL<br>        Defendants. | CASE NO. 8:18-cv-01253-JLS-ADS<br><br><br>**ORDER (1) GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND (2) DENYING ORGAIN'S MOTION FOR SUMMARY JUDGMENT** |

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Before the Court are cross Motions for Summary Judgment filed by Defendants and Plaintiff.  (Def's Mot., Doc. 104; Orgain's Mot., Doc. 107-4.)[1]  The parties timely opposed. (Orgain's Opp., Doc. 171; Def's Opp., Doc.151.)  And the moving parties replied.  (Def's Reply, Doc. 102; Orgain's Reply, Doc.159-5.)

Having considered the parties' briefs and heard oral arguments, the Court GRANTS IN PART Defendants' Motion for Summary Judgment and DENIES Plaintiff's Motion for Summary Judgment.

## I.   **BACKGROUND**

### A.   **Factual Background**

Plaintiff Orgain, Inc. ("Orgain") and Defendants[2] market nutritional supplements. On July 18, 2018, Orgain filed suit against Defendants in this Court, alleging that they manufacture, market, and distribute competing products with packaging that unlawfully trades on Orgain's "organic protein" mark and on Orgain's associated dress.  (First Amended Complaint ("FAC"), Doc. 53, ¶¶ 50–72.)  In particular, Orgain claims that Defendants market and promote a competing plant-based nutritional supplement adorned with the "organic protein" mark in black font against a white background, framed by green bands that circumscribe the top and bottom of the packaging, as well as a green leaf motif and colored boxes highlighting the dietary profile of the product.  (*Id.* ¶¶ 30–31.)  Orgain further alleges that Defendants have altered the packaging of their nutritional supplement on multiple occasions between July 2014 and May 2017 to more closely resemble Orgain's packaging.  (*Id.* ¶¶ 33–35.)

---

[1] Orgain moves for summary judgment as to all claims.  (Orgain Notice of Motion, Doc. 108.) Defendants seek summary judgment of this action in its entirety or, in the alternative, partial summary judgment as to individual claims. (Doc. 104.)

[2] This Order refers to Defendants Northern Innovations Holding Corp. dba Purely Inspired; Lakeside Innovations Holding Corp.; Innovations Holding Corp.; Iovate Health Sciences International, Inc.; Iovate Health Sciences International U.S.A., Inc.; and Kerr Investment Holding Corp. collectively as "Defendants."

Based on the foregoing, Orgain asserts claims for (1) federal trademark and trade dress infringement under the Lanham Act, 15 U.S.C § 1125; (2) unfair competition under Cal. Bus. & Prof. Code § 17200 *et seq*.; (3) false advertising under Cal. Bus. & Prof. Code § 17500 *et seq*.; and (4) common law claims of trademark infringement and unfair competition.  (FAC ¶¶ 57–91.)  Orgain seeks monetary damages, disgorgement of profits, injunctive relief, and attorneys' fees.

## B.   Cross Motions for Summary Judgment

Defendants and Orgain now bring the present cross motions for summary judgment. Each party contends it is entitled to summary judgment in its favor on Orgain's (1) trademark claim, (2) trade dress claim, and (3) state law claims.  Orgain also requests that, if it prevails on the liability issues, this Court issue a permanent injunction, and award attorneys' fees, and treble damages.  The Court summarizes the parties' arguments below.

### 1.  Orgain's Trademark Claim

Defendants first argue that the term "organic protein" is generic as a matter of law, and therefore not a protectable trademark, or, in the alternative, even if "organic protein" is descriptive rather than generic, the undisputed facts establish that the mark has not acquired secondary meaning.  (Def's Mot. at 20–23; 27–30.)  Orgain opposes Defendants' motion on both fronts.  At oral argument, counsel for Orgain maintained that Orgain is also seeking summary judgment on this claim.  Orgain's opening brief is less than clear on this point.  While Orgain unmistakably argues that it is entitled to summary judgment on its trade dress claim, its briefing contains few arguments specific to the "organic protein" term; instead, Orgain frequently discusses its "organic protein" mark as an element making up its trade dress.  (*See* Orgain's Mot. at 12–22.)  Nevertheless, based on counsel's representations, the Court will treat Orgain's motion as seeking summary judgment on its trademark claim.

## 2. Orgain's Trade Dress Claim

Both parties contend they are entitled to summary judgment on Orgain's claim for trade dress infringement.

### i. Trade Dress—Definition

The parties' briefs engage in some back-and-forth about the proper scope of the Orgain trade dress at issue here.  As a preliminary matter, the parties agree on the basic trade dress definition Orgain pleaded in its First Amended Complaint ("FAC"), and provided in its discovery responses:

> Orgain's trade dress includes the term ORGANIC PROTEIN in a unique, black font against a white background located just above the center of the container with its house brand located above ORGANIC PROTEIN. ORGANIC PROTEIN is framed inside green bands that circumscribe the top and bottom portions of the container. The term ORGANIC is positioned directly on top of the term PROTEIN. The term ORGANIC and PROTEIN are in a similar font. The front label also incorporates a green leaf and colored areas highlighting the dietary profile of the product.

(Orgain's Statement of Genuine Issues ("Orgain's SGI"), Doc. 171-1, ¶ 29.)[3]

However, Defendants contend that Orgain is relying on trade dress from a number of different product lines that it sold between 2013 and the present; that Orgain's trade dress designs have varied drastically and lack a unifying theme; and that the only common denominator in Orgain's diverse design and color schemes are the terms "Orgain" and "Organic Protein."  (Def's Mot. at 17; Orgain's SGI ¶¶ 26–27.)  Moreover, Defendants contend that some of Orgain's packaging (*see, e.g.*, *infra*, Figures 12–14, Orgain's SGI ¶¶ 26–27) conflicts with the claimed trade dress, as defined above.  For example, some of the packaging does not feature the term "organic protein" between two green bands:

---

[3] The Court quotes the definition Defendants offer as an "undisputed fact."  Defendants are, in turn, quoting the FAC and Orgain's interrogatory responses.  Orgain, in its response to Defendants' Statement of Undisputed Facts, does not *dispute* this is the proper definition, but rewords the definition (its own definition) put forward by Defendants to add further specificity to the arrangement of elements on the label.  Orgain's rephrased response is needlessly unwieldy and does not create a "factual dispute."

4

1
2
3
4
5
6

 

12)        13)        14)

7
8
9
10
11

However, Orgain clarifies that it is "relying [only] on the trade dress on its flagship plant-based powder."  (Orgain's Opp. at 13 (citing Orgain's SGI ¶¶ 53–55).)  Specifically, Orgain proffers the "organic protein" packaging depicted below, which first appeared on store shelves January of 2014.  (Orgain's SGI ¶ 53.)

12
13
14
15
16
17
18
19



20
21
22

Orgain asserts that the label for this product was updated in August 2017 in the manner depicted below (*see id*.):

23
24
25
26
27
28

5

1

2

3

4

5

6

7

8

9

10       Orgain asserts that all products in the "organic protein" line have the same

11   overall look and feel and include all of the asserted elements of the claimed trade dress.

12   Orgain puts forth the following exemplars to illustrate the overall commercial impression

13   of this line.  (Orgain's SGI ¶ 26.)

14

15

16

17   

18

19

20       Accordingly, the trade dress at issue here is limited to Orgain's line of "organic

21   protein" products, which must meet the undisputed definition set forth above.

22

23       **ii.**    **Trade Dress—the Parties' Arguments**

24       Defendants contend that most of the elements used in the claimed trade dress (*i.e.*,

25   use of green, bands, use of black font on white background) are functional, that the

26   remaining, non-functional elements of the trade dress are not inherently distinctive, and

27   that the trade dress has not acquired secondary meaning.  (Defendants' Mot. at 18–19.)

28   Orgain contends that its claimed trade dress, when viewed as a whole, is non-functional.

1   Specifically, Orgain contends that the claimed trade dress is non-functional because it

2   comprises at least 20 different elements, which are arranged in an arbitrary manner and do

3   not serve to make the packaging cheaper or easier to manufacture.  Orgain further contends

4   that its trade dress is inherently distinctive and, in the alternative, that even if it is not

5   inherently distinctive, it has acquired secondary meaning.  (Orgain's Mot. at 11–16.)

6

7                        **3.  Orgain's State-Law Claims**

8          Finally, the parties move for summary judgment on Orgain's state-law claims.

9   Defendants argue that Orgain's unfair competition law claim, false advertising claim, and

10  common law claims for trademark infringement and unfair competition fail because they

11  are dependent on—or, in the case of the state trademark claim, governed by an identical

12  standard as—Orgain's federal trademark and trade dress claims.  (Def's Mot. at 33.)

13  Orgain argues that "[r]egardless of any finding regarding trademark or trade dress rights,"

14  it is entitled to summary judgment that Defendants engaged in unfair business practices

15  and therefore violated the UCL. (Orgain's Mot. at 22.)  Specifically, Orgain contends that

16  Defendants "ha[d] no legitimate reason to copy the [trade dress] and [could] use the terms

17  'organic' and 'protein' fairly to describe its products without deceiving consumers."  (*Id.*)

18

19  **II.    LEGAL STANDARD**

20         Summary judgment shall be granted "if the movant shows that there is no genuine

21  dispute as to any material fact and the movant is entitled to judgment as a matter of law."

22  Fed. R. Civ. P. 56(a).  *See also Fortyune v. American Multi-Cinema, Inc.*, 364 F.3d 1075,

23  1079-80 (9th Cir. 2004) ("Summary judgment is appropriate 'if the pleadings, depositions,

24  answers to interrogatories, and admissions on file, together with the affidavits, if any, show

25  that there is no genuine issue as to any material fact and that the moving party is entitled to

26  a judgment as a matter of law.'" (quoting Fed. R. Civ. P. 56(c))).  "A dispute about a

27  material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict

28  for the nonmoving party.'" *Freecycle Sunnyvale v. Freecycle Network*, 626 F.3d 509, 514

(9th Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)).  A fact is "material" when its resolution "'might affect the outcome of the suit under the governing law.'"  *George v. Morris*, 736 F.3d 829, 834 (9th Cir. 2013) (quoting *Anderson*, 477 U.S. at 248).

"Where the party moving for summary judgment would bear the burden of proof at trial, that party 'has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case.'"  *Bernstein v. Virgin Am., Inc.*, 365 F. Supp. 3d 980, 984 (N.D. Cal. 2019) (quoting *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000)).  By contrast, when the moving party would not bear the burden of proof at trial, that party "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

"If the moving party satisfies its initial burden of production, the nonmoving party must produce admissible evidence to show that a genuine issue of material fact exists."  *Bernstein*, 365 F. Supp. 3d at 984 (citing *Nissan Fire*, 210 F.3d at 1102).  "If the nonmoving party fails to make this showing, the moving party is entitled to summary judgment."  *Bernstein*, 365 F. Supp. 3d at 984 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).  The non-moving party does not meet this burden by showing "some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). The United States Supreme Court has held that "[t]he mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient."  *Anderson*, 477 U.S. at 252.  Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Id.* at 250.  When ruling on a summary judgment motion, the Court must examine all the evidence in the light most favorable to the non-moving party.  *Celotex*, 477 U.S. at 325.  The Court cannot engage in credibility determinations, weighing

8

of evidence, or drawing of legitimate inferences from the facts; these functions are for the jury. *Anderson*, 477 U.S. at 255. Without specific facts to support the conclusion, a bald assertion of the "ultimate fact" is insufficient. *See Schneider v. TRW, Inc.*, 938 F.2d 986, 990–91 (9th Cir.1991).

## III.    **DISCUSSION**

Primarily at issue in the cross-motions are Orgain's two claims under the Lanham Act. *First*, the parties argue they are entitled to summary judgment on Orgain's claim of trademark infringement based on Defendants' use of the term "organic protein" in connection with its competing products. *Second*, the parties argue they are entitled to summary judgment on Orgain's trade dress infringement claim based on the resemblance of Defendants' packaging to its own. *Third*, the parties move for summary judgment on Orgain's state-law claims.

### A.    **Orgain's Trademark Claim**

Orgain argues that Defendants' use of the term "organic protein" in connection with its plant-based protein powder infringes Orgain's trademark rights. To succeed on its trademark claim under the Lanham Act, Orgain must show that (1) it has a valid, protectable mark, and (2) use of the mark by Defendants is likely to cause consumer confusion. *OTR Wheel Engineering, Inc. v. West Worldwide Services, Inc.*, 897 F.3d 1008, 1022 (9th Cir. 2018) (internal citations omitted). Because the term "organic protein" is not registered, it enjoys no presumption of validity, and Orgain has the burden of proving the first element is met. *See Talking Rain Beverage Co. Inc. v. South Beach Beverage Co.*, 349 F.3d 601, 603 (9th Cir. 2003).

Whether a term is protected, and the extent of that protection, depends on the term's strength, which is in turn determined by its distinctiveness. Trademark law categorizes terms along a spectrum of distinctiveness: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; and (5) fanciful. *KP Permanent Make–Up, Inc. v. Lasting Impression I, Inc.*,

408 F.3d 596, 602 (9th Cir. 2005).  Only the first two categories are at issue here.

Defendants maintain that "organic protein" is a generic term and cannot be protected under

trademark law, and that, even if the term is descriptive, it has failed to acquire secondary

meaning.  Orgain argues that its "organic protein" mark is descriptive, has acquired

secondary meaning, and is therefore entitled to protection.

For the reasons discussed below, the Court concludes that (1) Defendants are

entitled to summary judgment because Orgain has failed to offer sufficient facts to

establish that "organic protein" is a generic term and, accordingly, Orgain would not be

able to meet its burden to prove non-genericness at trial and (2) Defendants are also

entitled to summary judgment on the separate and alternative ground that Orgain has failed

to offer sufficient facts to prove "organic protein" has acquired secondary meaning.

Having concluded that Orgain cannot bear its burden of proving validity, the Court does

not reach the parties' respective arguments on whether Defendants' use of "organic

protein" is likely to create consumer confusion.

## 1.  Whether the "Organic Protein" Mark is Generic

Defendants first argue that "organic protein" is generic.  "Generic marks give the

general name of the product; they embrace an entire class of products." *Kendall–Jackson

Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 n. 8 (9th Cir.1998).  Generic

marks are generally not capable of receiving protection because they identify the product,

rather than the product's source. *KP Permanent Make–Up*, 408 F.3d at 602.  Descriptive

marks, on the other hand, "define a particular characteristic of the product in a way that

does not require any exercise of the imagination." *Surfvivor Media, Inc. v. Survivor

Productions*, 406 F.3d 625, 632 (9th Cir.2005).  A descriptive mark can receive trademark

protection if it has acquired distinctiveness by establishing "secondary meaning" in the

marketplace. *Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc*., 198 F.3d 1143,

1147 (9th Cir.1999); *Kendall–Jackson Winery*, 150 F.3d at 1047. An example of a

descriptive mark is "Honey Roast" for nuts roasted with honey. *Kendall–Jackson Winery*,

150 F.3d at 1047 n. 8.  Whereas examples of generic terms include "liquid controls" for equipment that dispenses liquid, and "Multistate Bar Examination" for a bar examination that may be taken across multiple states.  *Surfvivor Media*, 406 F.3d at 632 (citation omitted).  As noted above, because the term "Organic Protein" is unregistered, Orgain bears the burden of proving it is not generic.  *See e.g., Yellow Cab Co. v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 927 (9th Cir. 2005).

The Ninth Circuit often applies the "who-are-you/what-are-you" test to determine whether a term is generic.  *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1391 (9th Cir.1993).  Under the test, if the mark answers the question "What are you?" then it is generic and cannot be a valid trademark because its primary significance is to describe the type of product rather than the producer.  A protectable mark, on the other hand, identifies the source of the product by answering the questions: "Who are you?" "Where do you come from?" "Who vouches for you?"  *Filipino Yellow Pages, Inc. v. Asian Journal Publications, Inc.*, 198 F.3d 1143, 1147 (9th Cir. 1999) (internal citations and quotations).  At the motion for summary judgment stage, courts rely on a variety of evidence to determine whether a term is generic: (1) common meanings and dictionary definitions of the words in the term; (2) use by the party opposing genericness; (3) the existence of other companies marketing a similar product under the same term; and (4) general use of the term by the public, including consumer surveys.  *See Premier Nutrition, Inc. v. Organic Food Bar, Inc.*, No. SACV 06-0827 AGR(NBX), 2008 WL 1913163, at *4 (C.D. Cal. Mar. 27, 2008), aff'd, 327 F. App'x 723 (9th Cir. 2009).

### i.    Common Meaning and Dictionary Definition

Courts look to the common meaning and the dictionary definition of the words making up the term at issue.  The two words making up "organic protein" are generic.  As Defendants note, the Cambridge Dictionary defines "organic" as "not using artificial chemicals in the production of plants and animals for food" and "protein" as "one of the many substances found in food [.]" (Orgain's SGI ¶ 24.)  Each of the two words is generic.

11

Nor does viewing the two words here as a composite, as the Court must, save the term from being generic.  *See California Cooler, Inc. v. Loretto Winery, Ltd*., 774 F.2d 1451, 1455 (9th Cir. 1985) ("Words which could not individually become a trademark may become one when taken together.") (internal citations and quotation marks omitted). Although there is no dictionary definition for "organic protein," the composite term is generic on its face.  *See United States Patent & Trademark Office v. Booking.com B. V.*, 140 S. Ct. 2298, 2306 (2020) ("A compound of generic elements is generic if the combination yields no additional meaning to consumers capable of distinguishing the goods or services."); *Calista Enterprises Ltd. v. Tenza Trading Ltd*., 43 F. Supp. 3d 1099, 1121 (D. Or. 2014) ("Even where a composite term is not listed in a dictionary, it is still possible to find that composite term generic.").  Notably, here, applying the Ninth Circuit's "who are you/what are you" test, the term "organic protein" answers only the question "what are you?"; the term does not tell a potential buyer anything about where the product comes from or the company vouching for its quality.

### ii.  Use by Orgain

Next, the Court looks to whether the party opposing genericness—Orgain—itself uses the term generically.  Defendants point to numerous statements by Orgain that they contend show Orgain using the term "organic protein" in a generic sense.  Defendants note that, in 2014, Orgain proclaimed on its website that "organic protein is the engine of all Orgain products."  (Def's Mot. at 15 (citing Defendants' Statement of Undisputed Facts ("Def's SUF"), Doc. 104-2, ¶ 23).)  Defendants further point to a 2019 article on Orgain's website, quoting Orgain's owner as stating that "[he] made it [his] mission to formulate a drink that would actually make a difference in [his] health. It had to be . . . high in organic protein . . . ." (*Id*.)  Finally, Defendants note that Orgain's website states: "Orgain™ provides 255 nutrient-dense calories with a perfect 2:1 ratio of organic carbohydrates to organic protein," (Frank Report Part 1, Doc. 104-9, at 56–57; Ex. H to Frank Decl. at 12),

1  and that, in its FAQ, when queried "what's in Orgain?"  the website responds "16 grams of

2  the highest quality Organic Protein to help build lean muscle."  (*Id*.)

3          As Defendants correctly argue, the uses of "organic protein" cited above "do not

4  refer to the name of [Orgain's] product."  (Def's Reply at 18.)  As used by Orgain in the

5  examples cited above, the term "organic protein" answers the question of "what are you"

6  rather than "who are you."  Notably, Orgain states that "Orgain™" is comprised of

7  "organic protein," and "organic carbohydrates."  And when asked "what's inside Orgain,"

8  the website responds "16 grams of the highest quality Organic Protein."  (*See* Ex. H to

9  Frank Decl. at 12.)  These descriptions tend to show that Orgain used the term "organic

10  protein" as a generic name for a class of compounds used in its nutritional supplement and

11  not as a source-identifying term or brand name.

12          Orgain does not dispute that it used "organic protein" in the manner described

13  above; however, it contends that the statements show *descriptive* uses of "organic protein,"

14  not generic ones.  (Orgain's Opp. at 19–20.)  But Orgain fails to explain how any of the

15  cited statements show Orgain using "organic protein" as a *descriptor* of its products'

16  quality, character, or ingredients.  Moreover, Orgain—not Defendants—bear the burden of

17  proof on non-genericness.  Yet, Orgain has put forth no evidence to show it has used

18  "organic protein"—rather than "Orgain" or "Orgain's Organic Protein"—as a brand.

19  Orgain's conclusory arguments that the evidence put forth by Defendants shows

20  "descriptive" use does not create a genuine issue of material fact.

21

22          **iii.     Use by Other Companies**

23          Defendants aver that other companies in the nutritional supplement market use

24  "organic protein" generically in connection with their products.  In support, they proffer

25  evidence to show that at least four competitors in the protein supplement market (*i.e.*,

26  Vega, Garden of Life, Orgain, and Defendants) all sell an "organic protein"-titled product.

27  (*See* Def's Mot. at 13–14; Orgain's SGI ¶¶ 19–21.)  And at least thirty more companies

28  sell products with the words "organic" and/or "protein" prominently featured on the

13

packaging.  (*Id*.)  Defendants' expert, Dr. Robert M. Frank, collects examples of "organic protein" titled products in his report.  (Ex. I to Frank Report, Docs. 86-9 to 86-12.)[4]

Orgain does not dispute that its direct competitors use the term "organic protein," but argues that the examples collected in the Frank Report show descriptive use.  (Orgain's Opp. at 20; *see generally* McCassy Decl., Doc. 97-12.)  Again, Orgain cannot defeat genericness by arguing that "organic protein" is descriptive.  Evidence that other companies in the same marketplace sell products using the same term tends to show that the term refers to a category of products produced by many manufacturers, and not to a product produced by a specific manufacturer.  In many of the uses documented by the Frank Report (e.g., Vega sells a product called "Organic Protein"), "organic protein" is used as the title of the product.  Orgain fails to explain why, in its view, other companies' uses of "organic protein" are descriptive whereas Defendants' use of the same term allegedly infringes Orgain's trademark rights.

Again, as the party bearing the burden of proof, it was incumbent on Orgain to proffer evidence that third parties use "organic protein" as a brand name or signifier of *Orgain's* products as opposed to a type of nutritional supplement.  Orgain takes issue with Defendants' evidence of genericness.  But it proffers no affirmative evidence that "organic protein" is a source-identifier.

### iv.   Survey Evidence

The ultimate test of whether a term is generic is how it is understood by the consuming public.  *See United States Pat. & Trademark Off. v. Booking.com B. V.*, 140 S. Ct. 2298, 2307 (2020).  Orgain and Defendants each proffer expert surveys to support their view of how the public understands the term "organic protein."  Orgain proffers a modified

---

[4] (1) Vega "Organic Protein & Greens;" (2) Garden of Life "Organic Protein;" (3) "Raw Organic Protein;" (4) Vegan Smart "Organic Protein" (5) Purity Products "Organic Protein Smoothie;" (6) Vitaminway "Organic Protein;" (7) Muscle Pharm "Plant-Based Organic Protein;" (8) Vegan Pure "Organic Protein;" (9) Nutribiotic "Organic Protein + Greens & Veggies;" (10) Sotru "Organic Protein;" (11) Amazing Grass "Organic Protein & Kale;" (12) Svelte "Organic Protein Shake;" (13) Silver Fern "Plant-Based Organic Protein + Gut Health."  (Ex. I to Frank Report.)

Teflon survey by Hal Poret, which shows that 74% of respondents believed the term "organic protein" was descriptive.  ("Poret Survey," Doc. 98-22.)  Defendants also proffer a Teflon survey, concluding that 88% of consumers understand "organic protein" to be a category of products rather than a brand name.  ("Stewart Survey," Doc. 104-8; Def's Mot. at 16 (citing Def's SUF ¶ 13).)

The Teflon survey is so named after the consumer survey in *E.I. DuPont de Nemours & Co. v. Yoshida International, Inc*., 393 F. Supp. 502 (E.D.N.Y.1975), which has since become a widely accepted and persuasive way to present evidence of genericness or lack thereof.  In that case, both parties introduced survey evidence on whether "Teflon" had become a generic term.  Three of the surveys asked open-ended questions. The court discounted those surveys, concluding that by asking respondents to supply common names or brand names for non-stick coating, those surveys prompted respondents to supply a name (Teflon), without regard to whether the principal significance of the name supplied was "its indication of the nature or class of an article, rather than an indication of its origin."  *Id.* at 527.  The fourth survey, however, explained the difference between a brand name and a common name and then asked whether each of eight names, including "Teflon," was a brand name or a common name.  *DuPont*, 393 F.Supp. at 526.  The court found that the fourth survey was "[t]he only survey which really gets down this critical element of the case," and "that of the principal significance of the [] mark to the public." *Id.* at 527.  Teflon surveys are those modeled after the fourth survey in DuPont.

Here, Defendants' Stewart Survey followed the original Teflon survey design. Stewart conducted an internet questionnaire, utilizing a sample population of 400 respondents who had purchased protein powder or protein shake in the past twelve months or who indicated that they planned to purchase protein powder or protein shake in the next twelve months.  (*See* Stewart Survey, Doc. 104-8, ¶¶ 15, 21.)  As is typical of the design of Teflon surveys, respondents were first given instructions regarding the meaning of a brand name and a common name.  Specifically, respondents were instructed that a "common name" is "[the name] by which you to all products that are of a certain type or class," and

that a "brand name" is "the brand of a particular company that makes a particular product in a larger class of products."  (Ex. C to Stewart Survey, Doc. 104-8, at ECF Page 116.)  In order to assure that respondents understood the difference between a common name and a brand name, respondents were asked whether "Kraft" and "oatmeal" were brand names or common names.  (Stewart Survey, Doc. 104-8, ¶ 23; Ex. C.)  Respondents who did not answer these questions correctly were excluded from the remainder of the survey.  (*Id*.)

Respondents who were selected to continue with the survey were then shown a series of eight words or word combinations: Organic Protein, Oreo, Cookie, Vitamin, Pringle's, Corn Flakes, Kellogg's, and Burt's Bees.  (*Id*.)  The order of presentation of these words was rotated from respondent to respondent.  Respondents were asked to indicate whether they thought each word or term referred to a brand name, a common name, they did not know, or they had never heard of the word.  The questionnaire then explained: "[W]e sometimes use a brand name and actually mean a common name or we use a common name and actually mean a brand name."  (Ex. C to Stewart Survey at ECF Page 120.)  Respondents were asked whether they used each of the eight foregoing words or terms (including "organic protein") mainly as a brand name, mainly as a common name, both as a brand name and common name, or that the never use the name.

Of the 400 respondents in the Stewart Survey, 7% identified the words "organic protein" as a brand name, while 88% of the respondents identified the term as a common name.  The remaining respondents indicated they did not know whether these words were a brand name or a common name, or they indicated that they had never heard of the name.  Moreover, 67% of the respondents indicated that they primarily use organic protein as a common name, 7% indicated that they primarily use organic protein as a brand name, and 7% indicated that they use organic protein as both a brand name and common name (19% indicated that they do not use the term).  (Stewart Survey ¶¶ 28–30.)  Accordingly, Defendants have provided evidence to show that the relevant consuming public views "organic protein" as generic.

Orgain counters with the Poret Survey, which it proffers as evidence that "organic

1    protein" is descriptive, not generic.  Poret explains that, while the original Teflon Survey

2    concerned the question of whether a clearly fanciful brand name (TEFLON) had

3    subsequently become generic, here the relevant question is whether the term "organic

4    protein" is descriptive, as claimed by Orgain, or generic.  (Poret Survey, Doc. 98-22, at 5.)

5    Respondents were instructed that "[g]eneric terms identify a type or category of product,"

6    while "[d]escriptive terms describe an ingredient, characteristic, quality, feature, or

7    function of a product."  (*Id.*)  The Poret Survey listed "automobile," "ice cream" and

8    "allergy medicine" as examples of generic terms and "hatchback," "Rocky Road," and

9    "non-drowsy" as examples of descriptive terms.  (*Id.* at 6.)  To advance to the main

10   questionnaire, respondents had to identify "yogurt" and "bottled water" as generic and

11   "lemon lime" and "natural" as descriptive.  (*Id.* at 7.)  Respondents who made it through

12   were presented with a list of words or terms to identify as "generic" or "descriptive":

13   organic protein, creamy chocolate, lactose free, protein drink, and nutritional supplement.

14   (*Id.* at 8–9.)  Of the 300 respondents, 74.3% identified "organic protein" as a descriptive

15   term, and 24.3% answered that it is a generic term.  (*Id.* at 11.)

16         "To determine whether a term has become generic, we look to whether consumers

17   understand the word to refer only to a particular producer's goods or whether the consumer

18   understands the word to refer to the goods themselves."  *Yellow Cab Co. of Sacramento v.*

19   *Yellow Cab of Elk Grove, Inc*., 419 F.3d 925, 929 (9th Cir. 2005).  As a trademark plaintiff

20   asserting an unregistered mark, Orgain carries the burden of proving "organic protein" is

21   not generic.  However, the Poret Survey side-stepped the key inquiry—namely, whether

22   respondents understood "organic protein" to refer to Orgain's goods or whether they

23   understood the term to refer to a category of products.  Instead, the Poret Survey asked

24   respondents to identify words and terms as either descriptive or generic.  True, "generic"

25   and "descriptive" are separate legal definitions along the distinctiveness spectrum.  But the

26   genericness inquiry is not about where consumers categorize the mark along the

27   distinctiveness spectrum.  Rather, the genericness inquiry asks whether consumers

28   perceive the term as identifying a common name for a certain type or class of products.

1   *See United States Pat. & Trademark Off. v. Booking.com B. V.*, 140 S. Ct. 2298, 2307

2   (2020) (genericness turns on "whether consumers in fact perceive that term as the name of

3   a class or, instead, as a term capable of distinguishing among members of the class").

4          Consumer surveys are powerful evidence in the genericness analysis because they

5   are probative of whether the consuming public uses the term at issue generically or as a

6   source-identifier.  Poret could have questioned respondents on that point directly; instead,

7   however, he designed a survey that failed to ask respondents whether "organic protein" is a

8   common name or source-identifier.  The Poret Survey provides no evidence of whether the

9   consuming public views "organic protein" as a mark that identifies Orgain's products.

10  Accordingly, Orgain has failed to provide survey evidence of non-genericness.

11         Moreover, even if evidence of consumers categorizing a mark as descriptive were

12  relevant to non-genericness, the Poret Survey provided overlapping and confusing

13  definitions of "generic" and "descriptive"; therefore, its conclusion that 74.3% of

14  respondents identified "organic protein" as a descriptive term would not be admissible at

15  trial.  Specifically, the Poret Survey instructed participants that "[g]eneric terms identify a

16  type or category of product," while "[d]escriptive terms describe an ingredient,

17  characteristic, quality, feature, or function of a product."  (Poret Survey at ECF Page 5.)  It

18  further instructed that the terms "Hatchback" for vehicle, "Rocky Road" for frozen dessert,

19  and "Non Drowsy" for allergy medication should be deemed descriptive, not generic.

20  (Poret Survey at ECF Pages 33–34.)  But these examples are likely to confuse survey

21  participants when viewed in light of the definitions provided.  For example, "non-drowsy"

22  is a type or category of cold medicine, and "Hatchback" is a type or category of car.  By

23  the Poret Survey's own definition, those terms are therefore generic.  Similarly, Poret's

24  formulation of the questions compounds the confusion.  The Survey asked respondents to

25  categorize five terms, including "organic protein," as descriptive or generic.  But the

26  Survey failed to specify the products in connection with which the terms would be used.

27  Whether a mark is descriptive must be determined with reference to the products or goods

28  at issue.  *Surfvivor Media, Inc.*, 406 F.3d at 632 (9th Cir.2005) (descriptive terms "define a

18

1  *particular characteristic of the product* in a way that does not require any exercise of the

2  imagination") (emphasis added).  The Court cannot ascertain how the 74.3% of

3  respondents who categorized "organic protein" as descriptive understood "generic" versus

4  "descriptive" marks.  Defendants, on the other hand, have proffered persuasive survey

5  evidence to show that the relevant consuming public identifies the term as a common

6  name.

7         In sum, the undisputed facts establish that the term "organic protein" is generic as a

8  matter of law.  Orgain has not, and cannot, meet its burden to prove non-genericness.

9

10                **2.  Whether "Organic Protein" Has Acquired Secondary Meaning**

11        Having concluded that "organic protein" is generic and cannot be protected as a

12  trademark, the Court need not reach whether the term has acquired secondary meaning.

13  Even assuming, however, that "organic protein" is descriptive, not generic, Orgain has

14  failed to proffer evidence to show that the term "organic protein" standing alone—as

15  opposed to "organic protein" when used in combination with the elements making up the

16  trade dress—has gained secondary meaning.  Defendants are entitled to summary

17  judgment on the trademark claim on the separate and alternative ground that the

18  undisputed facts establish that Orgain cannot satisfy its burden on this front.

19        A mark that is descriptive of the goods it identifies is not entitled to trademark

20  protection unless a plaintiff shows that the name has acquired secondary meaning.  *Japan*

21  *Telecom, Inc. v. Japan Telecom Am. Inc.,* 287 F.3d 866, 873 (9th Cir. 2002).  Secondary

22  meaning requires showing that there is "a mental recognition in buyers' and potential

23  buyers' minds that products connected with the [mark] are associated with the same

24  source."  *Id.*  "[T]o survive summary judgment [plaintiff] [is] required to come forward

25  with enough evidence of secondary meaning to establish a genuine dispute of fact."  *Id.*  In

26  evaluating secondary meaning, courts look to a number of factors, including "(1) whether

27  actual purchasers of the product bearing the claimed trademark associate the trademark

28  with the producer, (2) the degree and manner of advertising under the claimed trademark,

(3) the length and manner of use of the claimed trademark, and (4) whether use of the

claimed trademark has been exclusive."  *Comm. for Idaho's High Desert, Inc. v. Yost,* 92

F.3d 814, 822 (9th Cir.1996) (internal quotation marks omitted).

In support of secondary meaning, Orgain proffers a survey conducted by Professor

Michael Belch, Professor of Marketing and Director for the Centre for Integrated

Marketing Communications at San Diego State University.  (Belch Survey, Doc. 98-9.)

Belch designed the survey to measure unaided consumer recognition of Orgain's trade

dress, and collected 304 responses from consumers who had shopped in the past year at an

online retailer or at a brick and mortar store, and had purchased a plant-based protein

powder in the 6 months prior.  (Belch Survey ¶¶ 12–13.)  The participants were shown

either a "test condition" photo, featuring the Orgain trade dress, but removed the "Orgain"

logo, or a "control condition" photo, featuring packaging resembling the claimed trade

dress but removing the "Orgain" logo; the green bands on the label; the green lid; the term

"organic protein"; and instead featuring the term "protein powder" in a font different than

Orgain uses on its product.  (*Id*. ¶ 14.)

The survey then inquired (*see id.* ¶ 15; App. II and III):

 *Do you associate this image with…?*

*1. The package design of one company or brand*

*2. The package design of more than one company or brand*

*3. The package design of no particular company or brand*

*4. Don't know / none*

If the respondent answered that the image was the package design of one company

or brand, they were asked the follow up question:

*What makes you say that? (Please type in your response)*

In the test group (viewing the package as a whole), 59% identified the package as

belonging to one company or brand.  In the control group, 23% believed that the control

package design was that of one company or brand.  The Belch Survey concluded that a net

total of 36% (59% - 23%)[5] of respondents believed Orgain package emanated from one company or brand.  (Belch Survey ¶¶ 23–24.)

Although the Belch Survey provides evidence that a little over one-third of consumers tend to associate the claimed *trade dress* as emanating from a single source, the Survey did not inquire whether "organic protein," standing alone, has acquired secondary meaning.  Indeed, the Belch Survey's self-stated objective was "to conduct a marketing research study to determine if the *trade dress* of the Orgain Organic Protein branded plant-based protein powder is associated with a single source[.]" (Belch Survey at 1 (emphasis added).)  And, in his deposition, Belch conceded that his survey was not designed to ascertain whether the mark, as opposed to the trade dress, had acquired secondary meaning. (Belch Depo. 242:24–243:3 ("Q: Can we agree that your survey does not establish anything regarding secondary meaning of the term Organic Protein as a trademark? A: Yeah. We were just looking at the overall trade dress and not the trademark, per se.").)  At oral argument, counsel for Orgain conceded that Orgain offers no evidence of whether consumers perceive the mark "organic protein"—as opposed to the trade dress as a whole—to emanate from a single source.

Orgain also proffers evidence of its marketing expenditures and promotional efforts as circumstantial evidence of secondary meaning.  Specifically, Orgain asserts that, in 2014, it spent approximately $4,063,732 in marketing, promotion, and sales expenses related to its organic protein products.  In 2015, Orgain spent approximately $9,739,389 in marketing, sales, and advertisement expenses related to the same.  Orgain also points to print, social media, and trade show advertising.  (Orgain's Statement of Undisputed Facts ("Orgain's SUF"), Doc. 129-2, ¶¶ 71–84.)  "Evidence of sales, advertising and promotional activities may be relevant in determining whether a trade dress has acquired a

---

[5] The Belch Survey explains that the percent of people who consider the control image to be from a single source is treated as the estimate of noise in the study. This noise estimate is then subtracted from the percentage of people in the test group (the Orgain packaging with house brand removed) who identified the focal image from a single source.

secondary meaning," but the advertising must draw attention to the features being claimed as a trademark or trade dress.  *See First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378 (9th Cir.1987).  Here, Orgain proffers no evidence to show whether the term "organic protein" featured prominently in its advertising or promotional efforts—indeed, it offers only evidence of expenditure "relating to" organic protein products.  But "[a] large expenditure of money does not in itself create legally protectable rights." *Id.*  Rather, the true test of secondary meaning is the *effectiveness* of the advertising effort.  *Art Attacks Ink, LLC v. MGA Ent. Inc.*, 581 F.3d 1138, 1146 (9th Cir. 2009) (emphasis added).  Orgain has failed to show that it has advertised the term "organic protein" in a manner that creates a genuine issue of fact as to secondary meaning.  And, where, as here, a trademark plaintiff has proffered no evidence of how consumers perceive the mark, evidence of advertising efforts will not preclude summary judgment as to secondary meaning.  *Id.*

Accordingly, Orgain has failed to create a genuine dispute of material fact on secondary meaning.  Defendants are entitled to summary judgment on this separate and alternate ground.

### 3.  Conclusion as to Orgain's Trademark Claim

For the foregoing reasons, Defendants are entitled to summary judgment on Orgain's trademark claim.  Having found that Orgain cannot meet its burden of proving validity, the Court does not reach the parties' respective arguments that they are entitled to summary judgment on whether Defendants' use of "organic protein" is likely to cause consumer confusion.

### B.  Orgain's Trade Dress Claim

The parties also move for summary judgment on whether Defendants' packaging infringes on Orgain's trade dress.  "Trade dress refers generally to the total image, design, and appearance of a product and 'may include features such as size, shape, color, color combinations, texture or graphics.'" *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d

1252, 1257 (9th Cir. 2001) (internal citations omitted).  To prevail on its claim for trade dress infringement, Orgain must prove that (1) its trade dress is nonfunctional, (2) its trade dress is inherently distinctive or has acquired distinctiveness through a secondary meaning, and (3) there is a likelihood that the consuming public will confuse Defendants' trade dress with Orgain's trade dress.  *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*, 158 F.3d 1002, 1005 (9th Cir. 1998).  The first two factors establish whether Orgain's trade dress is entitled to protection.  The final factor examines whether Defendants' packaging infringes on Orgain's rights.

For the reasons below, triable issues of material fact preclude summary judgment in favor of either party.

## 1. Non-Functionality

Orgain must first prove that the trade dress it seeks to protect is not functional.  A product feature is functional and cannot serve as a trademark if (1) the product feature is essential to the use or purpose of the article or (2) it affects the cost or quality of the article; that is, if exclusive use of the feature would put competitors at a significant, non-reputation-related disadvantage.  *Clicks Billiards, Inc. v. Sixshooters, Inc.,* 251 F.3d 1252, 1258 (9th Cir. 2001) (quoting *Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 U.S. 159, 165 (1995)).  Functional aspects of a product make the product easier to use or cheaper to manufacture.  *First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1381–1382 (9th Cir.1987).  Features that are arbitrarily affixed or included for aesthetic purposes are generally non-functional.  *Clicks Billiards, Inc.,* 251 F.3d at 1260; *but see Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1073 (9th Cir. 2006) (noting that even non-utilitarian, purely aesthetic features like a box shape or use of color may be "aesthetically functional," and therefore unprotectable, when they serve no source-identifying function and their exclusive use "would put competitors at a significant non-reputation-related disadvantage").

Defendants argue that "Orgain cannot meet its heavy burden of proving non-

23

functionality because the main constituents of Orgain's alleged trade dress are functional." (Def's Mot. at 24.)  First, Defendants argue that the claimed trade dress is functional to the extent it includes the term "organic protein," which Defendants argue is generic for the reasons set forth in their trademark argument, discussed above.  (*Id.* (citing *Avery Dennison Corp. v. Acco Brands, Inc.*, No. CV 99-1877 DT(MCX), 1999 WL 33117262, at *15 (C.D. Cal. Oct. 12, 1999) ("functional aspects of packaging include the use of generic or descriptive matter that informs the public of the nature or function of the product itself").)  Defendants' second argument is that having "organic protein" or any other term "in unique black font against a white background" is a functional.  (Def's Mot. at 19.) Defendants proffer evidence to show this is a basic packaging strategy used by many other companies to make lettering visible from shelves.  (Def's Mot. at 19 (Def's SUF ¶ 31).) Finally, Defendants contend that use of "green bands that circumscribe the top and bottom portions of the container" and "incorporat[ing] a green leaf and colored areas highlighting the dietary profile of the product" are functional, because green and a green leaf are commonly used to identify "organic" or healthy products.  In support, Defendants submit evidence that at least nine products sold in connection with the words "organic" and "protein" use a green-dominant theme and that over twenty of Orgain's competitors use a "green leaf" on their packaging to denote "organic" or healthy.  (Def's Mot. at 19 (Def's SUF ¶¶ 34–35).)

True, at first glance many of the *individual* elements comprising the claimed trade dress appear functional.  For example, the shape of Orgain's packaging and the green bands on the label—while not *per se* unprotectable—are also commonly used by other companies in the organic protein market, and Orgain has adduced no evidence that granting it exclusive use of those elements would not put those competitors at a "significant non-reputation-related disadvantage."  *See Au-Tomotive Gold, Inc.*, 457 F.3d at 1073 (9th Cir. 2006) (purely aesthetic features like a box shape or use of color are not protected when they do not serve as a source-identifier and when granting exclusive use of them would put competitors at a significant non-reputation-related disadvantage).  But

24

1   when evaluating functionality "[the] focus [is] not on the individual elements [of the trade

2   dress], but rather on the overall visual impression that the combination and arrangement of

3   those elements create."  *Clicks Billiards, Inc.*, 251 F.3d at 1259.

4          Importantly, here, Orgain does not contend that competitors should be precluded

5   from using any individual element comprising its claimed trade dress.  (Opp. at 12.)

6   Rather, Orgain claims exclusive rights only as to this specific combination of elements

7   comprising the claimed trade dress.  Specifically, Orgain contends that its claimed trade

8   dress, when taken as a whole, is non-functional because "[it] is an arbitrary combination of

9   a number of different elements."  (Orgain's Opp. at 4 (citing Orgain's SGI ¶ 29).)  Orgain

10  offers testimony in support of the assertion that its trade dress does not provide a practical

11  benefit in the manufacturing process.  (Orgain's Opp. at 12 (citing Orgain's SGI ¶ 56).)

12  Accordingly, Orgain has proffered evidence showing that the elements of the claimed trade

13  dress are arranged as they are for aesthetic reasons, not because of any functional

14  advantage.  *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1262 (9th Cir. 2001)

15  ("That the design decisions were made for aesthetic reasons—and not, for example,

16  because they were the only, the cheapest, or the most efficient way to design [the trade

17  dress]—is evidence of nonfunctionality.").

18         Accordingly, Defendants are not entitled to summary judgment on the basis of

19  functionality.

20

21                **2.  Distinctiveness**

22         A trademark plaintiff must show its trade dress is inherently distinctive or has

23  acquired distinctiveness by developing secondary meaning.  *Clicks Billiards, Inc.*, 251

24  F.3d at 1262.

25                **i.   Inherent Distinctiveness**

26         Orgain first contends that its trade dress is inherently distinctive.  "The predominant

27  test for inherent distinctiveness asks whether (1) the design or shape is a common, basic

28  shape or design; (2) it was unique or unusual in a particular field; and (3) it was a mere

1    refinement of a commonly-adopted and well-known form of ornamentation for a particular

2    class of goods which consumers view as mere ornamentation." *Mattel, Inc. v. MGA Ent.,*

3    *Inc.*, 782 F. Supp. 2d 911, 1004 (C.D. Cal. 2011) (citing McCarthy on Trademarks and

4    Unfair Competition § 8:13 (4th ed. 2010), which in turn cites *Seabrook Foods, Inc. v. Bar–*

5    *Well Foods, Ltd.*, 568 F.2d 1342 (C.C.P.A.1977)).  "If the trade dress is of such an unusual

6    design that a buyer will immediately rely on it to differentiate the source of the product,

7    then it is inherently distinctive."  *See id.*

8         Orgain offers no analysis of these factors, nor does it proffer any specific evidence

9    in support.  Instead, Orgain—the party carrying the burden of proof—maintains that the

10   claimed trade dress is inherently distinctive because "[it is] an arbitrary combination of a

11   number of different elements."  (Orgain's Mot. at 4–5 (citing Orgain's SUF ¶¶ 20–21).)

12   Orgain also takes issue with Defendants' rebuttal evidence.  Specifically, Orgain argues

13   that Defendants' evidence that other competitors employ trade dress elements similar to

14   Orgain's does not undermine inherent distinctiveness because "the specific combination of

15   elements in the [claimed trade dress] has not been adopted by anyone other than

16   [Defendants]."  (Orgain's Mot. at 12.)  Orgain asserts that "[w]here different competitors

17   separately employ different elements of a trade dress, the key inquiry is whether the

18   combination of all elements conveys an overall impression of distinctiveness."  (*Id.* (citing

19   *Cf.  Paramount Farms Int'l LLC v. Keenan Farms Inc*., 2012 U.S. Dist. LEXIS 190634,

20   *15 (C.D. Cal. 2012).)  Orgain asserts in conclusory fashion that because its claimed trade

21   dress is comprised of an arbitrary combination of different shapes, colors, and terms,

22   "there can be no question that it is inherently distinctive" when viewed as a whole.  (*Id.*)

23        Orgain's conclusory assertions of inherent distinctiveness are insufficient.  As

24   discussed above, Defendants have proffered evidence that Orgain's competitors use

25   packaging with similar aesthetic elements, including jar-shaped containers; labels using

26   color block; the term "organic protein" on the label; a green leaf to denote "organic" food;

27   and color bands.  (Def's Mot. at 19 (citing Def's SUF ¶¶ 34–35).)  Defendants' evidence

28   tends to prove that Orgain's design is "a mere refinement of a commonly-adopted and

1    well-known form of ornamentation for a particular class of goods" and not "unique or

2    unusual in [this] particular field." *See Mattel, Inc.*, 782 F. Supp. 2d at 1004.  Moreover,

3    the claimed trade dress, on its face, features a "common, basic" package shape and label

4    design.  *Id.*  Orgain fails to explain how its simple packaging creates an overall design

5    distinct from trade dress used by others in the nutritional supplement market.  *Cf.*

6    *Paramount Farms Int'l LLC*, 2012 U.S. Dist. LEXIS 190634, *15 (C.D. Cal. 2012)

7    (finding a triable issue existed as to inherent distinctiveness in part because plaintiff used a

8    different color scheme and font than its competitors).

9         In sum, Orgain has failed to meet its burden on inherent distinctiveness, so the

10   Court must analyze whether it has alternatively met its burden by showing secondary

11   meaning.

12              **ii.      Secondary Meaning**

13        Orgain argues that even if the claimed trade dress is not inherently distinctive it has

14   acquired secondary meaning.  Trade dress acquires secondary meaning when the

15   purchasing public associates it with a single producer rather than with the product itself.

16   *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 823 (9th Cir. 1993)(internal

17   citations omitted).  In other words, secondary meaning is "a learned association, an

18   'acquired distinctiveness.'"  *Id.* (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S.

19   763, 769 (1992)).  "While evidence of a manufacturer's sales, advertising and promotional

20   activities may be relevant in determining secondary meaning, the true test of secondary

21   meaning is the effectiveness of this effort to create it."  *Int'l Jensen, Inc.*, 4 F.3d at 824

22   (internal citations omitted).

23        Whether a trade dress has acquired secondary meaning is a question of fact that can

24   be resolved on summary judgment only when the undisputed record leaves no triable issue.

25   *See Cont'l Lab'y Prod., Inc. v. Medax Int'l, Inc.*, 114 F. Supp. 2d 992, 1002 (S.D. Cal.

26   2000).  Courts look to (1) the length and exclusivity of use of the trade dress; (2) the nature

27   and extent of advertising and promotion of the trade dress (3) the existence of substantial

28   advertising; (4) the product's established place in the market; (5) proof of intentional

copying; and (6) "look for" promotion that specifically directs a consumer's attention to those features claimed as trade dress. *Walker & Zanger, Inc. v. Paragon Indus., Inc*., 549 F. Supp. 2d 1168, 1179–80 (N.D. Cal. 2007) (citing *Yankee Candle Co. v. Bridgewater Candle Co., LLC*, 259 F.3d 25, 42 (1st Cir. 2001).)

As to direct evidence of secondary meaning, Orgain proffers the Belch Survey, summarized in Section III. A, which concluded that 36% of survey respondents identify the Orgain trade dress as emanating from a single source. (Belch Survey ¶¶ 23–24.) Defendants cite to *Walker & Zanger, Inc. v. Paragon Industries, Inc*. for the proposition that Orgain's own results undercut its argument that the trade dress has gained secondary meaning. (Def's Opp. at 25 (citing *Walker & Zanger, Inc. v. Paragon Indus., Inc*., 549 F. Supp. 2d 1168, 1179 (N.D. Cal. 2007).) While some courts have, indeed, found a 36% showing did not raise a factual issue precluding summary judgment and instead weighed *against* a finding of secondary meaning, *see Walker & Zanger*, other courts have found a 35% showing to be persuasive evidence of secondary meaning, *see Shuffle Master, Inc v. Awada*, 2006 U.S. Dist. LEXIS 66418, *8 (Nev. 2006). While the Blech Survey alone may have been insufficient to save Orgain from summary judgment, here, Orgain has also proffered circumstantial evidence of secondary meaning.

*First*, Orgain proffers evidence of actual confusion. Substantial evidence of actual confusion can be evidence of secondary meaning, whereas evidence of a few instances of such confusion cannot preclude summary judgment. *Japan Telecom, Inc. v. Japan Telecom Am. Inc*., 287 F.3d 866, 874 (9th Cir. 2002). Here, Orgain identifies 16 Amazon reviews, 23 social media posts, and 13 direct communications from consumers. (Orgain's Reply at 16–23.) Some of the examples Orgain sets forth tend to show consumers actually confused Defendants' product for Orgain's. (Orgain's SUF ¶155 (Amazon review stating, "DON'T BUY!!! Bought this thinking it was Orgain on accident (which I use daily and absolutely love)").) Other examples show consumers reaching out to Orgain to note the similarities between Defendants' packaging and Orgain's. (Orgain's SUF ¶154 ("Any chance you can look into the similarities of 'Purely Inspired' packaging? I bought it on

28

Amazon thinking it was your company's product and upon getting it realized it wasn't Orgain!").)  Finally, Orgain puts forward evidence that marketing representatives mistakenly placed Orgain's shelf talkers—the advertisements that stick out from shelves in stores—on Defendants' products in Walmart stores, or vice versa.  (Orgain's SUF ¶107.)  Thus, evidence of actual confusion is substantial, but not overwhelming given the size of the relevant market and the fact that the parties' products have co-existed on the market since 2015.

*Second*, Orgain has done enough to raise a genuine dispute of fact about whether Defendants copied Orgain's trade dress.  Orgain has no direct evidence on this point, but it argues that because Orgain's name came up in surveys that Defendants conducted in support of rebranding their label, and because the rebranded labels look more like Orgain's than Defendants' previous label, it must be inferred that Defendants copied Orgain's label to trade on its success.  Specifically, Orgain proffers evidence that, in June 2015, Defendants conducted a survey comparing their product's first label to its eventual second label.  (Orgain's SUF ¶¶ 78–80.)  The survey indicated that 77% of those surveyed preferred the new label, and that the new green theme and the colorful display of nutrition facts, which are parts of Orgain's claimed trade dress, contributed to the new label's popularity.  (*Id*.)  Moreover, as part of a second rebrand, Defendants conducted two additional surveys in June 2017.  In one survey, consumers were asked to write the names of all the plant-based protein brands they knew of, and Orgain was a frequent response.  (*Id.* ¶ 62.30.)  Ultimately, Defendants introduced a third label.  (*Id.* ¶¶ 88–89.)  Orgain points to the more prominent "organic protein" mark on this the new label as proof that Defendants intended to copy Orgain.

Defendants counter that Orgain's circumstantial evidence does not hold up because, given this sequence of events, there is no dispute that Defendants designed their "organic protein" packaging before surveying consumers about Orgain.  Defendants explain that, in 2015, they tested their new "organic protein" packaging against different designs to determine consumer preferences.  (Def's Opp. at 26–28 (citing Def's Statement of Genuine

Issues ("Def's SGI"), Doc. 151-1, ¶ 210).)  Of the four studies Defendants conducted in 2015, two featured packaging used by Defendants' competitors—but not Orgain—and the third study featured no competing products at all.  In a fourth study, conducted in July 2015, Defendants included Orgain along with several other competitors.  (*Id.*)  Moreover, Defendants put forward a declaration by Suleen Mak, Defendants' brand director, explaining that the changes to Defendants' packaging were unrelated to Orgain.  (*See generally* Mak Decl., Doc. 91-9.)  For example, Mak explains that Defendants changed the name of their product from "100% plant-based protein" to "organic protein" because they had just gotten the product approved as organic by the USDA.  (Mak Decl. ¶ 8.)  But Defendants do not dispute that they measured the popularity of their new packaging against Orgain's before launching it, and there remains a triable issue about whether the similarity between Orgain packaging and Defendants' leads to an inference of actual copying.

In sum, because Orgain has proffered *some* direct evidence of secondary meaning and has additionally raised sufficient circumstantial evidence of secondary meaning, Defendants are not entitled to summary judgment on the basis that the product lacks distinctiveness.  The Court next examines the likelihood of confusion element of the trade dress claim.

### 3.  Likelihood of Confusion

In order to establish likelihood of customer confusion, Orgain must prove that Defendants' trade dress is likely to cause a reasonably knowledgeable and prudent purchaser to believe that Orgain manufactures or sponsors Defendants' products.  *Levi Strauss & Co. v. Blue Bell, Inc*., 778 F.2d 1352, 1359 (9th Cir. 1985).  In the Ninth Circuit, the familiar *Sleekcraft* factors guide the likelihood of confusion analysis: (1) the similarity of the trade dress; (2) the relatedness of the two companies' services; (3) the marketing channels used; (4) the strength of Plaintiff's mark; (5) Defendants' intent in selecting its mark; (6) evidence of actual confusion; (7) the likelihood of expansion into other markets;

1   and (8) the degree of care likely to be exercised by purchasers.  *See AMF Inc. v. Sleekcraft*

2   *Boats,* 599 F.2d 341 (9th Cir.1979).

3        Here, Orgain has done enough to create a genuine issue of material fact as to

4   likelihood of confusion.  *First*, the first three factors—the similarity of the dress, proximity

5   of the goods, and use of similar marketing channels—constitute the "controlling troika in

6   the *Sleekcraft* analysis."  *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th

7   Cir. 2000).  It is undisputed that both Orgain and Defendants sell organic nutritional

8   supplement products.  (*See* Orgain's SGI ¶ 98.)  Nor do Defendants seriously dispute

9   Orgain's evidence that the parties sell their products through similar marketing channels.

10   (*See* Def's Opp. at 28–30; Def's SGI ¶ 25.)  Moreover, the claimed trade dress and the

11   allegedly infringing trade dress (pictured below) are similar in their overall impression.

12

13

14

15

16    

17

18

19

20

21        *Second,* there exist triable issues about actual confusion.  As discussed in Section

22   III. B. 2., Orgain proffers evidence of actual confusion.  While that evidence does not

23   conclusively establish secondary meaning or likelihood of confusion, it does raise triable

24   issues as to both.

25        *Third*, the parties submit competing expert surveys about whether consumers are

26   likely to confuse the source of the products.  Defendants proffer an *Eveready* survey

27   conducted by Matthew G. Ezell, a marketing research specialist, to show that the potential

28

for consumer confusion is very low.   (Ezell Survey, Doc. 95-13.)[6]  The Ezell Survey
found that "approximately four percent [] of the relevant universe of potential purchasers
of protein supplements are likely to be confused or deceived by the belief that Defendant's
'Organic Protein' product is made or put out by Orgain[.]" (*Id.* ¶ 7.)  Orgain counters with
a *Squirt* survey[7] by its own expert, Hal Poret, which concluded that a 17% likelihood of
confusion exists as to the powder products.  (Poret Squirt Survey, Doc. 98-21.)
Predictably, the parties take issue with the methodology employed by the other party's
expert.  For example, Defendants argue that a *Squirt* survey is, by Poret's own admission,
more suggestive than an *Eveready* survey.  (Def's SGI ¶ 301.)  Orgain maintains that the
Ezell Survey lacks probative weight because it does not measure whether consumers
would be confused if they encountered the products in the marketplace, which is likely to
be the case where, as here, market proximity is high.  (Orgain's SGI ¶ 14.)  But the parties'
arguments go to the weight of the evidence not its admissibility and are not appropriately
disposed of on summary judgment.  *See Globefill Inc. v. Elements Spirits*, Inc., 2016 WL
8944644, at *5 (C.D. Cal. Sept. 20, 2016) (weighing the competing *Squirt* and *Eveready*
surveys that the parties presented at trial).

   *Finally*, as discussed in Section III. B. 2, *supra*, triable issues remain as to whether
Defendants intentionally copied Orgain's trade dress.

   For the foregoing reasons, Orgain has done enough to raise genuine issues as to
likelihood of confusion and Defendants' motion for summary judgment as to the trade
dress infringement claim is DENIED.  Of course, as the Court has pointed out, while

---

[6] "[T]he 'Eveready' survey format does not inform survey respondents what the senior mark
is, but assumes that they are aware of the mark from their prior experience."  6 McCarthy on
Trademarks and Unfair Competition § 32:174 (5th ed.).  A standard *Eveready* survey presents
respondents with the accused product and asks respondents to identify the producer of the product.

[7] "The "Squirt" format presents a survey respondent with both of the conflicting marks. It does
not assume that the respondent is familiar with the senior mark. The method of telling the
respondent what the senior mark is can be either direct or subtle. A direct method is to ask in some
fashion if the respondent thinks that goods or services bearing the parties' marks A and B are from
the same source or different sources."  6 McCarthy on Trademarks and Unfair Competition §
32:174.50 (5th ed.).

Orgain has raised genuine issues of material fact, it has not established its entitlement to summary judgment in its favor on its trade dress infringement claim.

### C.   Orgain's State-Law Claims

Orgain and Defendants each argue in conclusory fashion that they are entitled to summary judgment on the state-law claims.

Defendants contend that Orgain's state-law claims fail because they are dependent on the doomed trademark and trade dress claims.  As discussed above, Orgain's trade dress claim survives.  Accordingly, Defendants are not entitled to summary judgment on Orgain's state-law claims.  Nor is Orgain entitled to summary judgment on its unfair competition claim.  Orgain argues that, trademark and trade dress rights notwithstanding, Defendants engaged in unfair competition because they copied Orgain's design.  As discussed above, triable issues of fact preclude summary judgment on the issue of actual copying.

## IV.   **CONCLUSION**

For the foregoing reasons, Defendants' motion is GRANTED IN PART. Defendants are entitled to summary judgment on Plaintiff's federal trademark claim. Defendants' motion is otherwise DENIED.  Orgain's motion is DENIED in its entirety.

DATED:  March 22, 2021

JOSEPHINE L. STATON
UNITED STATES DISTRICT JUDGE